# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Desmond Gilbert,<br><br>                          Plaintiff,<br>vs.<br><br>City of Minneapolis, and Minneapolis Police Officers Christopher Kelley, Evan Komarek and Joseph Foxley, all individuals being sued in their individual and official capacities,<br><br>                          Defendants. | Civil File No. _____<br><br>**COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)** |

Plaintiff Desmond Gilbert ("Plaintiff" or "Gilbert"), by his attorneys Nichols Kaster, PLLP, brings this action for damages and other legal and equitable relief, stating the following as his claims against the above-listed Defendants.

## PRELIMINARY STATEMENT

1. This case details yet another example of excessive force by the Minneapolis Police Department against an unarmed black man.

2. On October 29, 2019, Plaintiff Desmond Gilbert visited a friend's apartment at 17 East 24th Street in Minneapolis. Shortly after Gilbert arrived, several Minneapolis police officers knocked on the door of the apartment and spoke with one of the residents.

3. The officers, all of whom were white, were purportedly responding to a 911 call from a neighbor who heard loud voices coming from an unidentified apartment.

4. The occupants of the apartment, all of whom are black, answered the officers' questions without issue. But the officers, nonetheless, entered the apartment without permission and without a search warrant. The occupants tried to stop the officers and asked if they had a warrant to enter.

5. In response, officers slammed the male occupant against the door and yelled, "Get the f*** out of my face!"

6. The officers immediately dragged the male into the hallway, threw him to the ground, and placed him in handcuffs. Gilbert and two female occupants of the apartment followed the officers into the hallway and asked the officers why they were using such excessive force.

7. As Gilbert and the two females stood in the hallway, separate officers approached from behind, grabbed Gilbert, threw him against a wall, and sprayed mace in Gilbert's face. They then threw Gilbert to the ground, and three officers positioned themselves on top of him.

8. One officer had his knee on Gilbert's lower back, another had his knee on Gilbert's head. A third officer was holding Gilbert down with his body weight.

9. With three officers on top of him limiting his air flow, Gilbert began seizing. Officers, however, refused to move and remained on top of Gilbert.

10. A fourth officer then indicated that Gilbert was having a seizure and eventually the three officers removed themselves from Gilbert and sat him upright in the hallway.

11. At no time did Gilbert actively resist or display aggression towards the officers.

12. The assault and excessive force officers used against Gilbert was a violation of the Fourth Amendment.

13. Gilbert brings suit under 42 U.S.C. § 1983 for the constitutional violations.

**THE PARTIES**

14. Plaintiff is an adult, black male who resides in Minnesota and is a member of a protected class.

15. Defendant City of Minneapolis ("the City") is a Minnesota municipal incorporation located in Hennepin County, Minnesota. The City operates the Minneapolis Police

Department ("MPD") and employed Defendants Komarek, Foxley, and Kelley as police officers with MPD at all times relevant to this action. The City is being sued directly pursuant to *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978).

16. Defendant Christopher Kelley is an adult male who, upon information and belief, was at all times relevant to the allegations set forth in this Complaint acting under color of state law in his capacity as a law enforcement officer employed by the City of Minneapolis, Minnesota. Plaintiff is suing Kelley in his individual and official capacities.

17. Defendant Evan Komarek is an adult male who, upon information and belief, was at all times relevant to the allegations set forth in this Complaint acting under color of state law in his capacity as a law enforcement officer employed by the City of Minneapolis, Minnesota. Plaintiff is suing Komarek in his individual and official capacities.

18. Defendant Joseph Foxley is an adult male who, upon information and belief, was at all times relevant to the allegations set forth in this Complaint acting under color of state law in his capacity as a law enforcement officer employed by the City of Minneapolis, Minnesota. Plaintiff is suing Foxley in his individual and official capacities.

## JURISDICTION AND VENUE

19. This is an action for monetary and declaratory relief under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b), as the events giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

A.     **Background of the Excessive Force Assault on Gilbert**

20.     At approximately 10:00 p.m. on October 29, 2019, officers from the Minneapolis Police Department responded to a 911 call from 2408 1st Avenue in Minneapolis.

21.     The caller indicated there were loud voices coming from the apartment building next door and he heard what sounded like slapping. The caller did not identify the apartment number, or the individuals involved.

22.     Officers Joel Hagen, Michael Kennedy and Jamy Schwartz of the Minneapolis Police Department responded to the location. According to their written reports, when they arrived, they heard arguing coming from the second floor of the apartment building located at 17 East 24th Street.

23.     Officers Hagen, Kennedy and Schwartz entered the building and proceeded to the second floor. Once there, the officers purportedly heard voices coming from apartment #202.

24.     Officer Kennedy knocked on the door and then announced that it was the police.

25.     Moments later, Marchelle Adams, a resident of apartment #202, opened the door. When Adams opened the door, there were no loud voices coming from inside.

26.     Officers explained why they were there, and Adams said that she had been arguing with her sister, but everything was fine.

27.     As Adams answered the officers' questions, Emmanuel Culver, who was visiting the apartment, walked down the hallway behind the open door.

28.     Officers yelled at Culver and accused him of hiding behind the door.

29.     Culver stepped out from behind the open door in front of officers and explained that the was walking down the hallway and was not hiding.

4

30. As the officers spoke with Adams and Culver, there was no evidence of distress inside the apartment and no occupants indicated that they needed assistance. Adams and Culver answered the officers' questions without issue.

31. Officer Kennedy next attempted to walk inside the apartment.

32. Officers had no probable cause to enter or search the apartment. The officers had no search warrant, no consent to search the apartment and there were no exigent circumstances that justified their entry.

33. When Officer Kennedy started to walk in, Adams and Culver objected to the entry and asked if the officers had a search warrant.

34. Officer Kennedy immediately turned towards Culver, who had his back toward the open door, grabbed Culver by his chest, threw him up against the door and yelled at Culver, "Get the f*** out of my face!"

35. Officer Kennedy immediately dragged Culver out of the apartment and into the hallway, and along with another officer, took Culver to the ground and placed him in handcuffs. Culver had done nothing to warrant his seizure, or the excessive force used by the officers, other than asking the officers if they had a search warrant.

36. The other occupants of the apartment, Adams, Keona Carter, and Plaintiff Desmond Gilbert followed as officers dragged Culver out of the apartment and into the hallway. Adams, Carter, and Gilbert questioned the officers why Culver was being arrested and why the officers were using excessive force.

37. Officer Schwartz stood in front of the officers on the ground with Culver and faced Adams, Carter and Gilbert in the hallway. Adams, Carter and Gilbert were asking

Schwartz why the officers were being so rough with Culver, and why he was being arrested. Officer Schwartz told Adams, Carter and Gilbert to back up.

38. At no point was Gilbert aggressive or a physical threat to the officers.

39. While in the hallway, one of the officers yelled, "calm down!"

40. Moments later, Officers Christopher Kelley and Karina Landmesser entered the hallway from the stairwell behind Adams, Carter and Gilbert.

41. Without notice, Officer Kelley grabbed Gilbert by the chest, threw him up against the wall, and yelled at Desmond, "don't tell me to calm down."

42. Prior to that time, Gilbert was neither actively nor passively resisting.

43. Even though Gilbert was not resisting, Officer Kelley immediately and unnecessarily sprayed mace into Gilbert's face. Officer Kelley continued his use of excessive force, throwing Gilbert to the ground face down inside the stairwell.

44. Two other officers, Evan Komarek and Joseph Foxley, arrived as Officer Kelley and others were using excessive force by slamming Gilbert to the ground. Officer Komarek claimed in his report that Gilbert was "actively resisting attempts to put his hands behind his back" and he could "hear Gilbert yelling and not following commands." Video of the incident demonstrates Officer Komarek's claims are false.

45. As Gilbert lay face down on the ground in the stairwell with Officer Kelley on top of him, Officer Komarek put his knee on Gilbert's head and Officer Foxley put his knee on Gilbert's torso.

46. As a direct and proximate cause of the excessive force used by Officers Kelley, Komarek and Foxley, Gilbert began to have a seizure as he lay face down in the stairwell.

6

47. Officers remained on top of Gilbert as he suffered a medical emergency. Finally, an unidentified officer noticed that Gilbert was having a seizure and was not resisting.

48. Only then did Officers Kelley, Komarek and Foxley release their restraints and sit Gilbert upright in the hallway. Officers then called for an ambulance.

49. More than ten MPD officers were in the stairwell while Officers Kelley, Komarek and Foxley used excessive force on Gilbert causing the seizure. The officers' failure to intervene is a violation of MPD Policy, 5-303.01, which requires officers to intervene to stop or attempt to stop inappropriately applied excessive force.

50. After approximately twenty minutes, paramedics arrived and took Gilbert to the ambulance. Gilbert was taken to the hospital, where he spent the night. Gilbert was billed for the ambulance and hospital stay.

51. Officers cited Gilbert for obstructing the legal process in violation of Minn. Stat. 609.50.1(2). These charges were later dismissed without hearing.

52. Following the incident, Gilbert filed an excessive force complaint with the MPD.

53. Upon information and belief, none of the officers involved were disciplined for their conduct directed toward Gilbert on October 29, 2019.

**B.    MPD Has a Custom and Policy of Disproportionate Use of Excessive Force Against Black People**

54. The MPD has a history of disproportionate use of force against members of the black community.

55. According to a recent New Your Times article, black people account for nearly 60% of the documented cases of use of force by MPD since 2015 despite only representing approximately 20% of the population. Richard A. Oppel Jr. and Lazaro Gamio, *Minneapolis Police Use Force Against Black People at 8 Times the Rate of Whites*, The New York Times,

7

June 3, 2020[1]. By contrast, white people account for just over 20% of the documented cases of use of force while accounting for roughly 60% of the city's' population. *Id.*

56. According to the research by the New York Times, "body-weight pinning" is the most frequent type of force deployed by MPD against black people. *Id.* Since 2015, body weight pinning has been used approximately 2,200 times against black people, more than twice the number of times the same tactic has been used against white people. *Id.*

57. The MPD has also deployed chemical irritants more frequently against black people than white people. The New York Times data indicates that of the 1,748 total instances where chemical irritants were deployed, 66% of those were deployed against black community members. *Id.*

58. The data also demonstrates that black residents of Minneapolis suffer roughly 66% of neck restraints, 59% of physical take downs or joint locks, and 59% of general restraint techniques. *Id.*

59. According to the MPD use of force policy in effect in or around October 2019, neck restraints and choke holds could only be used if and when a person was actively resisting. Choke holds and neck restraints were prohibited when a person was passively resisting, or not resisting at all.

60. In or around October 2019, knee restraints, whereby an officer places their knee on the neck or head of a person, were no longer taught as part of Minneapolis' police training courses. Neil MacFarquhar, *In George Floyd's Death, a Police Technique Results in a Too-Familiar Tragedy*, The New York Times, May 29, 2020[2]. According to Mylan Masson, a former

---

[1] Available at: https://www.nytimes.com/interactive/2020/06/03/us/minneapolis-police-use-of-force.html
[2] Available at: https://www.nytimes.com/2020/05/29/us/knee-neck-george-floyd-death.html.

police officer who directed the two-year training program at Hennepin Technical College that is required of all prospective officers, individuals were taught to apply pressure across the upper back instead of the head or neck, and as soon as threat was gone, officers were instructed to stop the application of force. *Id.*

## C. Prone Restraints Present an Obvious and Well-Known Risk for Constitutional Violations

61. Generally, prone restraint maneuvers consist of one or more officers holding an arrestee face down on the ground, and the officer or officers physically applying pressure with their hands, knees or other body party to the individual's shoulders, head, back, hips, and/or upper legs. The pressure applied prevents the individuals from moving out of the prone position, so the officers can, for example, place handcuffs on an individual who is resisting.

62. The use of prone restraints poses well-established risks of serious bodily injury or death by manual asphyxiation.

63. Because of these risks, law enforcement officers are taught to avoid restraining individuals in the prone position, or to do so for only a very short time.

64. As early as 1995, the United Statements Department of Justice warned law enforcement about the risks of serious bodily injury or death associated with prone restraints. National Law Enforcement Technology Center, Positional Asphyxia—Sudden Death at *1-3 (June 1995). According to the Department of Justice, "[a] person lying on his stomach has trouble breathing when pressure is applied to his back. The remedy seems relatively simple: get the pressure off his back." *Id* at *1. In addition, "[t]he risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position." *Id.* at *2.

9

65. Accordingly, the Department of Justice urged law enforcement that "[a]s soon as the suspect is handcuffed, get him off his stomach[,]" and "maximal, prone restraint techniques should be avoided." *Id.* at *2-3.

**D.     The City and MPD Had Full Knowledge of the Risks of Prone Restraints but Failed to Adequately Train Officers and Condoned the Use of Head and Neck Restraints**

66. The dangers of prone restraints have been well known to City of Minneapolis and MPD administrators, as well as MPD officers, for several years.

67. In 2013, the City was sued for the death of David Smith, a 28-year-old man who died after being restrained by MPD officers who used a prone restraint and knelt on the back of Mr. Smith for several minutes. *See Smith v. Gorman*, Case No. 11-cv-3071 (SRN/JJK).

68. Upon information and belief, during the *Smith* case, then-MPD Chief Timothy Dolan and several other high-ranking officials acknowledged the serious dangers posed by prone restraints.

69. In addition, as part of the settlement in the *Smith* case, the City of Minneapolis "agreed to require its sworn police officers to undergo training on positional asphyxia in the 2014 training cycle of the Minneapolis Police Department…"

70. Upon information and belief, the City of Minneapolis and MPD did not comply with the terms and/or the spirit of its 2013 Settlement Agreement with the family of Mr. Smith with respect to training on positional asphyxia.

71. Instead, upon information on belief, the City of Minneapolis routinely trains officers to place handcuffed arrestees in a prone position without proper training on putting arrestees in a recovery position and monitoring their breathing and consciousness.

72. MPD Use of Force Policy 5-311, in effect at the time of this incident, explicitly condoned the use of head and neck restraints, as well as choke holds. Under the policy, a neck

10

restraint was defined as "compressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck). A choke hold was defined as "applying direct pressure on a person's trachea or airway (front of neck), blocking or obstructing the airway."[3]

73. The City of Minneapolis and MPD's failure to properly train its officers on the use of excessive force and prone restraints, and its express approval of the use of head and neck restraints, was the direct and proximate cause of the excessive force experienced by Gilbert's and his resulting seizure.

**E.   The City of Minneapolis and MPD Fails to Discipline Officers Who Engage in Excessive Force, Use Unlawful Prone Restraints, and Fail to Follow Policy**

74. Upon information and belief, the City of Minneapolis and MPD have a long history of failing to discipline officers who engage in excessive force and use unlawful prone restraints.

75. For example, upon information and belief, the two officers who were responsible for the death of David Smith were not subject to any disciplinary or other remedial actions despite their clear constitutional violations.

76. In addition, since the death of George Floyd in May of 2020, it has been widely discussed that former Officer Derek Chauvin was the subject of upwards of 15 separate citizen complaints. The complaints resulted in an oral or written reprimand on only a handful of occasions, and Chauvin was permitted to remain on the force in active duty despite being involved in multiple incidents resulting in the serious bodily harm or death of citizens.

---

[3] MPD has since prohibited the use of head or neck restrains and choke holds entirely after the murder of George Floyd in the summer of 2020.

77. Indeed, multiple media outlets have outlined MPD's history of protecting officers despite multiple accusations of misconduct:

   a. *Minneapolis Police at Center of George Floyd's Death had a History of Complaints*, Kelley Benham French, Kevin Crowe, and Katie Wedell, USA Today, May 28, 2020[4];

   b. *Many Minnesota Police Officers Remain on the Force Despite Misconduct*, Coulter Jones and Louise Radnofsky, Wall Street Journal, June 25, 2020[5];

   c. *The Bad Cops: How Minneapolis Protects its Worst Police Officers Until it's too Late*, Max Nesterak and Tony Webster, Minnesota Reformer, December 15, 2020[6].

78. Officer Christopher Kelley, the officer who unnecessarily and with excessive force sprayed mace in Plaintiff's face, threw him the ground, and held him face down, in the prone position, causing Plaintiff to have a seizure, has been the subject of 20 separate complaints of misconduct while serving as a police officer.[7] Only three of those complaints resulted in any type of discipline, and the most severe discipline was a letter of reprimand. *Id.*

79. On October 29, 2019, Defendant officers violated several MPD policies.[8]

---

[4] Available at: https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1614782221/Thao_George_Floyd_video_sparks_outrage__police_records_detail_even_more.pdf?1614782221

[5] Available at: https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1614609686/Chauvin_Many_Minnesota_Police_Officers_Remain_on_the_Force_Despite_Misconduct_-_WSJ.pdf?1614609686

[6] Available at: https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1614285311/2020_The_Bad_Cops__How_Minneapolis_protects_its_worst_police_officers_until_it%E2%80%99s_too_late_-_Minnesota_Reformer.pdf?1614285311

[7] Source: Communities United Against Police Brutality website, Complaint Search, Christopher Kelley, Badge #3680, available at: http://complaints.cuapb.org/police_archive/officer/2137/, (last visited April 6, 2021).

[8] The policies referenced use the language of the polices as they existed in October 2019.

80. MPD Use of Force Policy 301.01 permitted officers to "only use the amount of force that is objectively reasonable in light of the facts and circumstances known to the employee at the time force is used." Objectively reasonable force could only be used when effecting a lawful arrest, in the execution of legal process, in enforcing an order of the court, or executing any other duty imposed upon the public officer by law." MPD Policy 5-303.

81. MPD Use of Force Policy 5-303.1 required every sworn MPD employee to "either stop or attempt to stop another sworn employee when force is being inappropriately applied or is no longer required."

82. MPD Use of Force Policy 5-304 stated that "officers shall use de-escalation tactics to gain voluntary compliance and to seek to avoid or minimize use of physical force." The policy stated officers should "[c]onsider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors, including . . . medical conditions."

83. MPD Use of Force Policy 5-306 required any officer who uses force that results in an injury, or who deploys chemical agents, to file a CAPRS report outlining the use of force by the end of the shift.

84. MPD Use of Force Policy 5-311 prohibits the use of neck restraints or choke holds against subjects who are passively resisting, or not resisting at all.

85. On October 29, 2019, Gilbert did not actively resist, he was neither accused of nor committed any crime, he did not flee, and he posed no safety threat to the officers or others. Gilbert stood in plain sight and calmly questioned officers about why they were using excessive force against Culver.

86. Despite this, Defendant officers, acting under the color of state law, deprived Gilbert of his right to be free from excessive force in violation of MPD policy. Defendant Kelley

13

aggressively grabbed Gilbert, sprayed mace in his face, threw him to the ground, and forced Gilbert into the prone position. While there, Officers Kelley, Komerek and Foxley used their knees and body weight to hold Gilbert down—one on his head, one on his torso, and one on his legs.

87. Defendant officers knew or reasonably should have known of the danger they placed Gilbert in by spraying mace in his face and unnecessarily and unjustifiably placing him in the prone restraint, with three officers using their body weight to pin Gilbert to the ground.

88. Officers Kelley, Komarek and Foxley use of constitutionally excessive force, and their refusal to abide by MPD policy, was the direct and proximate cause of the excessive force experienced by Gilbert and his resulting seizure.

89. Defendant officers also failed to use de-escalation techniques required under MPD policy, and instead escalated the interaction by using excessive force against Gilbert.

90. Defendant officers also failed to stop, or attempt to attempt, each other from applying excessive force against Gilbert.

91. Defendant officers also failed to file the required CAPRS report outlining their use of chemical agents and use of physical force against Gilbert.

92. Upon information and belief, none of the other officers involved have been disciplined due to their violation of MPD policy and use of unconstitutional excessive force against Gilbert.

93. The City of Minneapolis and MPD's failure to properly train its officers on the use of excessive force and prone restraints, and its express and tacit approval of the use of head and neck restraints while failing to discipline officers who violated MPD use of force policies,

was also the direct and proximate cause of the excessive force experienced by Gilbert and his resulting seizure.

## CAUSES OF ACTION

### COUNT I

**DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT – EXCESSIVE FORCE**
*(Defendants Kelley, Komarek, and Foxley)*

94. Plaintiff restates the preceding paragraphs as though fully stated herein.

95. Defendants Kelley, Komarek, and Foxley violated Plaintiff's Fourth Amendment right to be free from excessive force. Plaintiff was not actively resisting, fleeing, or a danger to himself or others, and he had not committed any crime.

96. By the actions described above, Defendants Kelley, Komarek, and Foxley acted under the color of state law, violated and deprived Plaintiff of Plaintiff's clearly established and well-settled right to be free from excessive force.

97. At the time Defendants Kelley, Komarek, and Foxley used force against Plaintiff, it was clearly established that police officers have an affirmative duty to intervene on behalf of people whose Fourth Amendment rights are being violated in their presence by one or more other officers. *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).

98. Defendants Kelley, Komarek, and Foxley failed to intervene on Plaintiff's behalf when each violated Plaintiff's clearly established constitutional rights.

99. Defendants Kelley, Komarek, and Foxley subjected Plaintiff to this deprivation of rights either maliciously or acting with reckless disregard for whether Plaintiff's rights would be violated by these actions.

100. As a direct and proximate result of the acts and omissions of Defendants Kelley, Komarek, and Foxley, Plaintiff suffered injuries, was forced to endure pain and mental suffering, and was thereby damaged in an amount yet to be determined.

101. Punitive damages are available against Defendants Kelley, Komarek, and Foxley and are hereby claimed as a matter of federal common law, *Smith v. Wade*, 461 U.S. 30 (1983).

102. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT – *MONELL* VIOLATIONS
*(Defendant City of Minneapolis)*

103. Plaintiff restates the preceding paragraphs as though fully stated herein.

104. Defendant City of Minneapolis intentionally, knowingly, recklessly, or with deliberate indifference to the rights of civilians, failed to supervise, instruct, and train, including through proper discipline, Defendants Kelley, Komarek, and Foxley to refrain from using unreasonable force.

105. Before October 29, 2019, Defendant City of Minneapolis, with deliberate indifference to the rights of civilians, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern, and practice of the part of its police personnel, including Defendants Kelley, Komarek, and Foxley of using excessive force.

106. As of October 29, 2019, Defendant City of Minneapolis maintained a custom and practice of deliberate indifference to the use of excessive force by its officers.

107. As a direct and proximate result of the acts and omissions, systemic flaws, policies, and customs of Defendant City of Minneapolis, Plaintiff suffered physical and

emotional injuries, was forced to endure unnecessary pain and suffering, and was thereby damaged in an amount yet to be determined.

108. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT – *CANTON* VIOLATIONS
*(Defendant City of Minneapolis)*

109. Plaintiff restates the preceding paragraphs as though fully stated herein.

110. Before October 29, 2019, Defendant City of Minneapolis with deliberate indifference to the rights of civilians, failed to properly train MPD officers or failed to require adherence to appropriate policies to avoid the improper use of excessive force and prone restraint maneuvers when arresting citizens.

111. Defendant City of Minneapolis, with deliberate indifference to the rights of civilians, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern, and practice of the part of its police personnel, including Defendants Kelley, Komarek, and Foxley of using excessive force, including the use of prone restraint maneuvers, without sanction or consequence.

112. As a direct and proximate result of the acts and omissions, systemic flaws, policies, and customs of Defendant City of Minneapolis in failing to train its officers, Plaintiff's civil rights were violated and he suffered physical and emotional injuries, was forced to endure unnecessary pain and suffering, and was thereby damaged in an amount yet to be determined.

113. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

17

**JURY DEMAND**

Plaintiff demands a jury trial.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A. As to Count One, enter judgment against Defendants Kelley, Komarek, and Foxley for compensatory damages in an amount exceeding $75,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988, and prejudgment interest;

B. As to Count Two, enter judgment against Defendant City of Minneapolis for compensatory damages in an amount exceeding $75,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988, and prejudgment interest;

C. As to Count Three, enter judgment against Defendant City of Minneapolis for compensatory damages in an amount exceeding $75,000, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988, and prejudgment interest;

D. For leave to add additional claims or defendants by motion or any other method approved by the Court;

E. For any and all punitive damages allowed under applicable law;

F. For an award to Plaintiff of their attorney's fees, disbursements, and the costs of this action;

G. For such other and further relief as the Court deems just and equitable.

Dated: October 21, 2021            **NICHOLS KASTER, PLLP**

s/Lucas J. Kaster
Matthew H. Morgan, MN Bar No. 304657
Lucas J. Kaster, MN Bar No. 396251
4700 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 215-6870
morgan@nka.com
lkaster@nka.com

**ATTORNEYS FOR PLAINTIFFS**