# Exhibit 11



| | NUMBER:<br>5-100 |
|---|---|
| **MINNEAPOLIS POLICE DEPARTMENT**<br>**OPERATIONS SECTION** | DATE:<br>18 JUNE 2018 |

**VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE**

**CODE OF CONDUCT**

## 5-101        CODE OF CONDUCT DEFINED

The code of conduct of the Minneapolis Police Department is promulgated by the Chief of Police by authority of the City Charter, Chapter 6, Section 1, as amended.This code is established to promote efficiency, discipline, and good public relations in setting forth policy governing the conduct of all Department employees.

The conduct of police officers is governed by the MPD Policy and Procedure Manual and applicable State and Federal law. All employees of the Minneapolis Police Department are required to maintain a working knowledge of and to obey the code of conduct, civil service rules, Departmental rules, policies, procedures and orders, ordinances of the City of Minneapolis, the laws of the State of Minnesota and the United States. The failure of an MPD employee to comply with the standards of conduct set forth in the Manual and in law will subject the employee to discipline and/or legal action. All disciplinary actions taken will be in accordance with Civil Service rules and provisions. (10/20/88) (12/01/08)

## 5-101.01        TRUTHFULNESS (01/26/05) (11/15/13)

The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer.

MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor, or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation. (12/14/07)

These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to, written reports, transmissions to MECC and officers via radio, telephone, pager, e-mail or MDC.

MPD employees are obligated under this policy to respond fully and truthfully to questions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business. (12/14/07)



City000219

## 5-101.02   VIOLATIONS OF THE CODE OF CONDUCT (03/13/07) (11/15/13)

Any member of the Department who violates the code of conduct is subject to discipline. Discipline may range from a written reprimand to termination. Discipline shall be imposed following a sustained violation. Refer to Civil Service Rule 11.03 regarding discipline. (11/16/94) (03/08/95) (03/13/07) (11/15/13)

The Chief of Police may relieve a departmental employee with pay pending an investigation of an alleged violation of criminal law, or a violation of the code of conduct.  Administrative leave is not discipline. (03/08/95) (03/13/07)

Probationary employees may be dismissed from service for failing to meet minimum performance standards or probationary training standards for violations of the code of conduct or for any other legal reason. There is no right of appeal for probationary employees unless the probationary employee is a veteran as provided by Civil Service Rules 11.06 and 11.07. (03/13/07)

Employees who no longer meet minimum job qualifications or who are no longer able to perform the essential functions of their job, for a period of 90 days or more due to a criminal conviction, court ordered restriction, driver's license restriction, POST license restriction or other adverse legal action due to criminal behavior are subject to termination from employment. (03/13/07)

## 5-102   CODE OF ETHICS (08/01/91)
(A-D)

All sworn and civilian members of the department shall conduct themselves in a professional and ethical manner at all times and not engage in any on or off-duty conduct that would tarnish or offend the ethical standards of the department. Employees shall abide by the City's Ethics in Government Policy, Chapter 15. (05/23/07)

## 5-102.01   MINNESOTA LAW ENFORCEMENT CODE OF ETHICS (08/01/91)
(A-D)

**MINNESOTA LAW ENFORCEMENT CODE OF ETHICS:**

"As a Minnesota Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both by personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential

nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear of favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement."

## 5-103        USE OF DISCRETION
(A-D)

The police profession is one that requires officers to use considerable judgment and discretion in the performance of their daily duties. Officers have a large body of knowledge from Department policies and procedures, training, their own professional police experience and the experiences of their fellow officers to guide them in exercising proper judgment and discretion in situations not specifically addressed by Department rules and regulations. In addition, officers must always adhere to the following principles in the course of their employment with the Minneapolis Police Department:

- POLICE ACTION - LEGALLY JUSTIFIED: Officers must act within the limits of their authority as defined by law and judicial interpretation, thereby ensuring that the constitutional rights of individuals and the public are protected. All investigative detentions, pedestrian and vehicle stops, arrests, searches and seizures of property by officers will be based on a standard of reasonable suspicion or probable cause in accordance with the Fourth Amendment of the U.S. Constitution and statutory authority. Officers must be able to articulate specific facts, circumstances and conclusions that support reasonable suspicion or probable cause. (11/17/15)
- EQUALITY OF ENFORCEMENT: Officers shall provide fair and impartial law enforcement to all citizens.
- LOYALTY: Officers shall be faithful to their oath of office, strive to uphold the principles of professional police service, and advance the mission of the Department.

## 5-104        IMPARTIAL POLICING (06/27/01) (11/17/15)
(A-D)

**A.** The MPD is committed to unbiased policing and to reinforcing procedures that ensure that police service and law enforcement is provided in a fair and equitable manner to all.

**B.** No person shall be singled out or treated differently as a consequence of his/her race, ethnicity, national origin, gender, sexual orientation or religion.

**C.** Except as provided below, officers shall not consider race, ethnicity, national origin, gender, sexual orientation or religion in establishing either reasonable suspicion or probable cause:

Officers may take into account the reported race, ethnicity, gender or national origin of a specific suspect or suspects on credible, reliable, recent, locally-based information that links specific suspected unlawful or suspicious activity to a particular individual or group of individuals of a particular race, ethnicity, gender or nationality. This information may be used in the same way officers use specific information regarding age, height, weight, etc. about specific suspects. (12/24/01)

## 5-104.01    PROFESSIONAL POLICING (12/24/01) (12/01/08)

Officers shall use the following practices when contacting any citizen, regardless of the reason for the contact: (07/24/15)

- Be courteous, respectful, polite and professional.
- Introduce or identify themselves to the citizen and explain the reason for the contact as soon as practical, unless providing this information will compromise the safety of officers or other persons.
- Ensure that the length of any detention is no longer than necessary to take appropriate action for the known or suspected offense. (07/24/15)
- Attempt to answer any relevant questions that the citizen may have regarding the citizen/officer contact, including relevant referrals to other city or county agencies when appropriate.
- Provide name and badge number when requested, preferably in writing or on a business card.
- Explain and/or apologize if you determine that the reasonable suspicion was unfounded (e.g. after an investigatory stop).
- If asked, provide the procedures for filing a complaint about police services or conduct.

## 5-105    PROFESSIONAL CODE OF CONDUCT (01/05/16)
(A-D)

**A. General**

1. Sworn employees shall give their name and badge number to any person upon request. (01/05/16)

   Civilian employees shall give their name and employee number to any person upon request. (01/05/16)

2. Employees shall conduct themselves in the buildings and offices of the Department in a manner which would not discredit the Department.

City000222

3. Employees shall treat all fellow employees with respect. They shall be courteous and civil at all times with one another. When on duty in the presence of other employees or the public, officers should be referred to by rank.

4. Employees shall use reasonable judgment in carrying out their duties and responsibilities. They need to weigh the consequences of their actions. (04/01/05) (05/03/05) (01/05/16)

5. Employees shall be decorous in their language and conduct. They shall refrain from actions or words that bring discredit to the Department. (04/01/93) (01/05/16)

6. Employees shall not display material that may be considered discriminatory, derogatory, or biased in or on City property. Specifically, discriminatory, derogatory or biased materials regarding race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, age, marital status, public assistance, or familial housing are prohibited. Such materials include, but are not limited to, calendars, cartoons, and posters. (10/18/92)

7. Employees who are required to drive a department vehicle as part of their official duties shall maintain a valid driver's license that is accepted by the State of Minnesota at all times as a condition of employment, and shall immediately report loss or limitation of driving privileges to their supervisor and to the Internal Affairs Unit. (04/23/10) (01/05/16)

8. Employees shall immediately report any violation of rules, regulations, or laws that come to their attention to the Internal Affairs Unit, regardless of the violator's assignment or rank within the Department.

   a. Employees must immediately, or as soon as reasonably possible, report any misconduct at the scene of an incident to their supervisor or the supervisor at the scene, as well as to the Internal Affairs Unit. This includes, but is not limited to, unreasonable force. (07/28/16)

9. Any employee charged, arrested, or cited for Driving Under the Influence (DUI) or a non-traffic violation, or notified they are being investigated for a criminal offense, shall immediately notify their chain of command and Internal Affairs or an on-duty supervisor, who will notify the Internal Affairs Unit. Notification shall consist of personal telephone communication (no voicemail messages) or written contact. Required information is the formal charge or allegation, date, time, and jurisdiction of alleged occurrence, and any special or relevant factors. (4/1/05)

   Employees will also notify the Internal Affairs Unit of the disposition at the time the charge or case is disposed. (10/28/94) (03/12/99)

City000223

10. When an employee is notified that an Order for Protection (OFP), Restraining Order (RA), or a Harassment Order (HA) has been filed against him or her, the employee shall immediately notify Internal Affairs and provide a copy of the OFP, RA, or HA, and the date scheduled for hearing the allegations made in support of the request for the order. The information is required for department compliance with Federal Law 18 U.S.C. Sec. 922 (g)(8). (01/05/2000)

11. Employees shall not publicly criticize or ridicule the Department, its policies or other employees as to the performance of their duties in a manner which is defamatory, obscene, unlawful, or in any other manner which impairs the effective operation of the Department or in a manner which displays a reckless or knowing disregard for the truth. This regulation shall not be construed so as to impair the exercise of free speech by employees on matters of public concern.

12. Employees shall avoid regular or continuous associations or dealings with persons whom they know, or should know, are under criminal investigation or indictment or who have a reputation in the community or Department for present involvement in criminal behavior, except as necessary in the performance of official duties, or when unavoidable because of family ties to the employee.

13. Employees shall not engage or participate in any form of illegal gambling at any time except in the performance of duty under specific orders of a superior officer.

**B. Drugs and Alcohol (01/05/16)**

1. Employees shall not bring to or keep any alcohol or non-prescribed controlled substance on departmental premises except for evidentiary purposes.

2. Off-duty employees shall not carry any firearm or ammunition while under the influence of alcohol or any controlled substance. (05/05/89) (04/01/93)

3. Employees shall not consume alcoholic beverages while on duty or in uniform unless it's necessary in the performance of a non-uniformed officer's undercover work. (3/12/99)

4. No employee shall be under the influence of alcohol or any controlled substance while on duty.

   a. All over-the-counter and prescription drug use shall be in accordance with the Employee Health and Wellness policy (P/P Section 3-500).

   b. All drug and alcohol testing shall be conducted in accordance with the conditions and procedures in the MPD Drug and Alcohol Testing policy (P/P Section 3-1000).

5. A reading of .02 blood/alcohol concentration is considered under the influence of alcohol.

City000224

### C. Language (01/05/16)

These provisions apply to all forms of communication, including but not limited to electronic communication and social networking. These provisions are in addition to the conditions in the Computer Use and Electronic Communication policy (P/P 4-220) and the Social Networking policy (P/P 7-119).

1. (A-D) Employees shall not use derogatory, indecent, profane or unnecessarily harsh language in the performance of official duties or while representing the MPD.

2. (C-D) Employees shall not use any discriminatory, derogatory or biased terms regarding race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, age, marital status, public assistance, or familial housing.

### D. Cases and Investigations

1. Employees shall not interfere with any criminal investigation being conducted by this department or any other law enforcement agency.

2. Employees shall not knowingly communicate in any manner, either directly or indirectly, any information that may assist persons suspected or accused of criminal acts to escape arrest or punishment or which may enable them to dispose of evidence.

3. Employees shall not recommend a dismissal, reduction of charges, or other disposition of a pending criminal case which has been previously filed in any criminal court or before a grand jury except by written approval of their division commander. A copy of the approval will be kept in the case file.

4. Employees shall not interfere with the attendance of witnesses or their testimony through coercion, bribery or other means.

5. Employees shall not attempt to have any traffic citation reduced, voided, or stricken from the calendar for personal or monetary consideration. (See Dismissal of Traffic/Parking Charges and Citations)

### E. Sworn Employees

1. All officers are required to take appropriate police action toward aiding a fellow officer exposed to danger or in a situation where danger may be impending.

2. On-duty officers shall, at all times, take appropriate action within their jurisdiction, to protect life and property, preserve the peace, prevent crime, detect and arrest violators of the law, and enforce all federal, state and local laws and ordinances. (02/28/93)

City000225

3. Uniformed officers shall render a military salute to the National Anthem, United States Flag or ceremonies at appropriate times. Officers in civilian dress shall render proper civilian honors to the United States Flag and National Anthem at appropriate times.

Uniformed officers at parades need salute only the massed national colors at the head of the parade. When the flag is six paces from the officer, the flag shall be faced and a hand salute rendered until the flag is six paces beyond the officer. Other United States Flags may be saluted if the officer's immediate attention to duty is not necessary.

**F. Gifts, Money and Property**

1. Any money other than that received from unclaimed properties paid or sent to any employee as a result of on-duty police action shall be promptly forwarded to MPD Finance. (03/21/97)

2. All property received as a result of on-duty police action shall be forwarded to the Property and Evidence Unit. The Property and Evidence Unit shall dispose of unclaimed property according to their policy and procedure manual. The property shall be disposed of by being sent to the City Store or to the Minneapolis Police Relief Association in accordance with state law. (03/21/97)

3. Employees shall not act as an intermediary in the payment of a reward for the return of stolen property without written authorization by the Chief of Police or his/her designee.

4. Employees shall not purchase, or have purchased for them, any auto/property sold at a city auction. Employees are also prohibited from owning any such auto/property purchased at a city auction for one year after the date that the auto/property is sold at the city auction. (01/10/97)

5. Employees shall pay all debts when due and shall not undertake any financial obligations which they know or should know they will be unable to meet. An isolated instance of financial irresponsibility will not be grounds for discipline except in unusually severe cases. However, repeated instances of financial difficulty may be cause for disciplinary action. Filing for a voluntary bankruptcy petition shall not, by itself, be cause for discipline. Financial difficulties stemming from unforeseen medical expenses or personal disaster shall not be cause for discipline provided that a good faith effort to settle all accounts is being undertaken. (10/20/88)

6. Soliciting or accepting personal gifts: (05/23/07)

   a. Employees shall not solicit or accept any gift from an interested person, lobbyist or principal who has a direct financial interest in a decision that that the employee is authorized to make.

   b. Exceptions. The prohibitions in this section do not apply if the gift is:

City000226

    i.   A campaign contribution as defined in Minnesota Statutes, Section 10A.01, subd 11;

    ii.   A service to assist an official in the performance of official duties, including, but not limited to providing advice, consultation, information and communication in connection with legislation, or services to constituents;

    iii.   A service of insignificant monetary value;

    iv.   A plaque or similar memento recognizing individual services in a field of specialty or to a charitable cause;

    v.   A trinket or memento of insignificant value;

    vi.   Informational material of unexceptional value;

    vii.   Food or a beverage given at a reception, meal or meeting away from the recipient's place of work by an organization before who the recipient appears to make a speech or answer questions as part of the program;

    viii.   Given because of the recipient's membership in a group, and an equivalent gift is given to the other members of the group; or

    ix.   Given by an interested person, lobbyist, or principal who is a related person to the recipient, unless the gift is given on behalf of someone who is not a related person.

    c.   An employee who receives any gift prohibited by this section shall return, dispose of, or request that the city council accept the gift on behalf of the city.

## 5-105.01    PROFESSIONAL CODE OF CONDUCT – DEPARTMENT-SANCTIONED SOCIAL EVENTS (02/22/05)

(A-D)

In an effort to remain professional at all times, including department-sanctioned social events, the following guidelines shall be followed:

- Officers are not allowed to solicit door prizes while on-duty or in the name of the Minneapolis Police Department for an event.
- Attendance at off-duty events is optional.
- Awarding alcoholic beverages as door prizes is prohibited.
- Complimentary alcoholic beverages are prohibited.
- If the event is not held on police department property, advertising at a public establishment connecting the gathering to the MPD is prohibited.

- Officers drinking alcoholic beverages at any department-sanctioned event are prohibited from carrying any firearms.
- Supervisors, while in attendance at said events, are reminded that they are responsible for the actions of officers under their command at an event.
- Inappropriate behavior at an event should immediately be reported to a supervisor.

If security is needed for an event, arrangements should be made by the organizer.

## 5-106      ON-DUTY CODE OF CONDUCT (06/18/18)
(A-D)

**A.** Officers shall respond without delay to calls for police service unless otherwisedirected by proper authority.

   1. Emergency calls for service shall take precedence. However, all dispatched calls shall be answered as soon as possible consistent with departmental procedures.

   2. If officers need to temporarily go out-of-service on a detail or otherwise be unavailable for calls, they shall notify their immediate supervisor and request permission for such details. (03/25/08)

**B.** Employees shall remain alert, observant, and occupied with police business during their tour of duty.

   1. When on duty, employees shall devote their entire attention to the business of the Department.

   2. It is a violation of this order for employees to conduct personal or private business while on duty or for officers to engage in policing for private interests while on duty.

**C.** Employees shall not make referrals to any attorney or other business from on-duty contacts.

**D.** Employees shall not allow anyone not employed by the Department to enter a police facility without permission of a supervisor.

   1. Employees shall not permit any person to enter a police facility to sell goods, offer them for sale, or to canvas or solicit for any purpose without authorization from the facility's acting commander.

**E.** Officers working uniformed patrol or in a marked squad who wish to go out of servicefor a meal break shall request OTL status from the MECC dispatcher. The request must include the requested OTL location. The dispatcher may grant or deny OTL status based on call load and staffing levels. (9/7/05)

1. Employees shall not take excessive time for meals and officers working two-officer squads must take OTL at the same time. (9/7/05)

2. No more than three marked or unmarked squads may be OTL at the same public location unless officers are also participating in a community event. (9/7/05)

## 5-107    PROCEDURAL CODE OF CONDUCT
(A-D)

1. No officer shall arrest any person or search any premises except with a warrant or where such arrest or search is authorized without warrant under the laws of the United States.

2. No officer shall falsely arrest, or direct any malicious prosecution against any person.

3. No employee shall willfully mistreat or give inhumane treatment to any person held in custody.

4. Officers shall not render aid or assistance in civil cases except to prevent an immediate breach of the peace or to quell an existing disturbance. Officers may inform any citizen of the steps necessary to institute a civil suit or advise citizens on protecting their rights.

5. Employees shall not willfully misrepresent any matter, sign any false statement or report, or commit perjury before any court, grand jury or judicial hearing.

6. Employees shall not knowingly remove or destroy, or cause such action, to any report, document, or record without authorization.

7. Employees shall not give any lawyer, bondsman, agent of either, or any other person unauthorized or confidential information regarding prisoners in confinement, suspects in a case, property held, or records of the Department.

8. Employees shall not make known any information concerning the progress or future actions to be taken on an open investigation to any person not authorized to receive such information by the case investigator or the commanding officer of the investigating unit.

| | | NUMBER:<br>5-200 |
|---|---|---|
|  | **MINNEAPOLIS POLICE DEPARTMENT**<br>**OPERATIONS SECTION** | DATE:<br>01 JANUARY 2002 |

**VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE**

**RESPONSIBILITIES OF POLICE OFFICERS**

## 5-201 RESPONSIBILITY OF ON-DUTY OFFICERS
(A-D)

In the City of Minneapolis, on-duty officers shall take all steps reasonably necessary to enforce the law after considering the tactical situation.

Minnesota Statutes 629.40 subd. 3 provides that when an on-duty licensed peace officer acting in obedience of an order of the court, or in the course and scope of their employment, or in fresh pursuit is outside of the officer's jurisdiction, that officer is serving in the regular line of duty as fully as though the service was within their jurisdiction. (11/14/88)

## 5-202 RESPONSIBILITY OF OFF-DUTY OFFICERS
(A-D)

Off-duty officers in their jurisdiction have peace officer authority. Officers shall consider the tactical situation and liability to themselves and the department.

By the City Council Resolution (84R-047), Minneapolis police officers do not have peace officer authority when they are off-duty and outside their jurisdiction. The City of Minneapolis will not provide liability protection or worker's compensation benefits to officers acting in a law enforcement capacity when they are off duty and outside their jurisdiction. In these situations, Minneapolis police officers only have the power of citizen's arrest. (11/14/88)

## 5-203 RESPONSIBILITY OUTSIDE OF THE STATE
(A-D)

Minneapolis police officers have peace officer authority outside of Minnesota only in incidents of fresh pursuit. Officers who are outside the boundaries of Minnesota for extradition, or other matters of direct concern to the City, are not to engage in police activities unless they are necessary in the performance of their duties as agents of the City, and then only after consideration of the tactical situation. (04/01/93)

## 5-204 REFUSAL TO WORK
(D)

Police officers do not have the right to strike or to engage in any work stoppage or slow-down.



| | MINNEAPOLIS POLICE DEPARTMENT OPERATIONS SECTION | NUMBER: 5-300 |
| --- | --- | --- |
| | | DATE: 18 OCTOBER 2019 |

**VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE**

**USE OF FORCE**

## 5-301        PURPOSE (10/16/02) (08/17/07) (07/28/16)

**A.** Sanctity of life and the protection of the public shall be the cornerstones of the MPD's use of force policy.

**B.** The purpose of this chapter is to provide all sworn MPD employees with clear and consistent policies and procedures regarding the use of force while engaged in the discharge of their official duties. (**Note**: MPD Training Unit Lesson Plans – Use of Force, are used as a reference throughout this chapter.)

## 5-301.01        POLICY (10/16/02) (08/17/07)

Based on the Fourth Amendment's "reasonableness" standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used. The force used shall be consistent with current MPD training.

## 5-301.02        STATE REQUIREMENTS (10/11/02)

The MPD shall comply with Minn. Stat. §626.8452 to establish and enforce a written policy governing the use of force, including deadly force and state-mandated pre-service and in-service training in the use of force for all sworn MPD employees. (08/17/07)

## 5-302        USE OF FORCE DEFINITIONS (10/16/02) (10/01/10)

**Active Aggression:** Behavior initiated by a subject that may or may not be in response to police efforts to bring the person into custody or control. A subject engages in active aggression when presenting behaviors that constitute an assault or the circumstances reasonably indicate that an assault or injury to any person is likely to occur at any moment. (10/01/10) (04/16/12)

**Active Resistance:** A response to police efforts to bring a person into custody or control for detainment or arrest. A subject engages in active resistance when engaging in physical actions *(or verbal behavior reflecting an intention)* to make it more difficult for officers to achieve actual physical control. (10/01/10) (04/16/12)

**Deadly Force:** Minn. Stat. §609.066 states that: "Force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing death or great bodily harm. The intentional discharge of a firearm other than a firearm loaded with less-lethal munitions and used by a peace officer within the scope of official duties, in the direction of another person, or at a vehicle in which another person is believed to be, constitutes deadly force." (10/01/10)

**Flight:** Is an effort by the subject to avoid arrest or capture by fleeing without the aid of a motor vehicle. (10/01/10)

**Great Bodily Harm:** Bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily harm.

**Non-Deadly Force:** Force that does not have the reasonable likelihood of causing or creating a substantial risk of death or great bodily harm. This includes, but is not limited to, physically subduing, controlling, capturing, restraining or physically managing any person. It also includes the actual use of any less-lethal and non-lethal weapons. (08/17/07)

**Objectively Reasonable Force:** The amount and type of force that would be considered rational and logical to an "objective" officer on the scene, supported by facts and circumstances known to an officer at the time force was used. (08/17/07)

**Passive Resistance:** A response to police efforts to bring a person into custody or control for detainment or arrest. This is behavior initiated by a subject, when the subject does not comply with verbal or physical control efforts, yet the subject does not attempt to defeat an officer's control efforts. (10/01/10) (04/16/12)

**Use of Force:** Any intentional police contact involving: (08/17/07) (10/01/10)

- The use of any weapon, substance, vehicle, equipment, tool, device or animal that inflicts pain or produces injury to another; or
- Any physical strike to any part of the body of another;
- Any physical contact with a person that inflicts pain or produces injury to another; or
- Any restraint of the physical movement of another that is applied in a manner or under circumstances likely to produce injury.

## 5-303      AUTHORIZED USE OF FORCE (10/16/02) (08/17/07)

Minn. Stat. §609.06 subd. 1 states, "When authorized…except as otherwise provided in subdivision 2, reasonable force may be used upon or toward the person of another without the other's consent when the following circumstances exist or the actor reasonably believes them to exist:

When used by a public officer or one assisting a public officer under the public officer's direction:

- In effecting a lawful arrest; or
- In the execution of legal process; or
- In enforcing an order of the court; or
- In executing any other duty imposed upon the public officer by law."

In addition to Minn. Stat. §609.06 sub. 1, MPD policies shall utilize the United States Supreme Court decision in Graham vs Connor as a guideline for reasonable force.

The Graham vs Connor case references that:

"Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including:

- The severity of the crime at issue,
- Whether the suspect poses an immediate threat to the safety of the officers or others, and;
- Whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of ***the reasonable officer*** on the scene, rather than with the 20/20 vision of hindsight.

The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."

Authorized use of force requires careful attention to the facts and circumstances of each case. Sworn MPD employees shall write a detailed, comprehensive report for each instance in which force was used.


## 5-303.01    DUTY TO INTERVENE (07/28/16)
(A-D)

**A.** Sworn employees have an obligation to protect the public and other employees.

**B.** It shall be the duty of every sworn employee present at any scene where physical force is being applied to either stop or attempt to stop another sworn employee when force is being inappropriately applied or is no longer required.

**5-304        THREATENING THE USE OF FORCE AND DE-ESCALATION
               (10/16/02) (06/01/12) (07/28/16)**

(A-D)

### A. Threatening the Use of Force

As an alternative and/or the precursor to the actual use of force, MPD officers shall consider verbally announcing their intent to use force, including displaying an authorized weapon as a threat of force, when reasonable under the circumstances. The threatened use of force shall only occur in situations that an officer reasonably believes may result in the authorized use of force. This policy shall not be construed to authorize unnecessarily harsh language. (08/17/07) (07/28/16)

### B. De-escalation

Whenever reasonable according to MPD policies and training, officers shall use de-escalation tactics to gain voluntary compliance and seek to avoid or minimize use of physical force. (06/01/12) (07/28/16)

1. When safe and feasible, officers shall:

   a. Attempt to slow down or stabilize the situation so that more time, options and resources are available.

      i. Mitigating the immediacy of threat gives officers more time to call additional officers or specialty units and to use other resources.

      ii. The number of officers on scene may make more force options available and may help reduce overall force used.

   b. Consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to:

      - Medical conditions
      - Mental impairment
      - Developmental disability
      - Physical limitation
      - Language barrier
      - Influence of drug or alcohol use
      - Behavioral crisis

      Such consideration, when time and circumstances reasonably permit, shall then be balanced against incident facts when deciding which tactical options are the most appropriate to resolve the situation safely.

City000234

2. De-escalation tactics include, but are not limited to:

- Placing barriers between an uncooperative subject and an officer.
- Containing a threat.
- Moving from a position that exposes officers to potential threats to a safer position.
- Reducing exposure to a potential threat using distance, cover or concealment.
- Communication from a safe position intended to gain the subject's compliance, using verbal persuasion, advisements or warnings.
- Avoidance of physical confrontation, unless immediately necessary (e.g. to protect someone or stop dangerous behavior).
- Using verbal techniques to calm an agitated subject and promote rational decision making.
- Calling additional resources to assist, including more officers, CIT officers and officers equipped with less-lethal tools.

# 5-305      AUTHORIZED USE OF DEADLY FORCE (08/17/07) (08/18/17)

## A. Statutory Authorization

Minn. Stat. §609.066 sub. 2 – "The use of deadly force by a peace officer in the line of duty is justified only when necessary:

- To protect the peace officer or another from apparent death or great bodily harm;
- To effect the arrest or capture, or prevent the escape, of a person whom the peace officer knows or has reasonable grounds to believe has committed or attempted to commit a felony involving the use or threatened use of deadly force, or;
- To effect the arrest or capture, or prevent the escape, of a person who the officer knows or has reasonable grounds to believe has committed or attempted to commit a felony if the officer reasonably believes that the person will cause death or great bodily harm if the person's apprehension is delayed."

## B. United States Supreme Court: Tennessee v. Garner

In addition to Minn. Stat. §609.066, MPD policies shall utilize the United States Supreme Court decision in Tennessee v. Garner as a guideline for the use of deadly force.

The Tennessee v. Garner case references that:

"Apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement."

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally *unreasonable*."

City000235

**C.** Sworn MPD employees shall recognize that:

- The use of a firearm, vehicle, less-lethal or non-lethal weapon, or other improvised weapon may constitute the use of deadly force.
- This policy does not prevent a sworn employee from drawing a firearm, or being prepared to use a firearm in threatening situations.

**D.** For the safety of the public, warning shots shall not be fired.

**E. Moving/Fleeing Motor Vehicles**

1. Officers are strongly discouraged from discharging firearms at or from a moving motor vehicle.

2. Officers should consider their positioning and avoid placing themselves in the path of a vehicle when possible. If officers find themselves positioned in the path of a vehicle they should, when possible, tactically consider moving out of the path of the vehicle instead of discharging a firearm at it or any of its occupants.

**F. Officers' Actions that Unnecessarily Place Themselves, Suspects, or the Public at Risk**

1. Officers shall use reasonableness, sound tactics and available options during encounters to maximize the likelihood that they can safely resolve the situation.

2. A lack of reasonable or sound tactics can limit options available to officers, and unnecessarily place officers and the public at risk.

## 5-306    USE OF FORCE – REPORTING AND POST INCIDENT REQUIREMENTS (08/17/07)

Any sworn MPD employee who uses force shall comply with the following requirements:

**Medical Assistance:** As soon as reasonably practical, determine if anyone was injured and render medical aid consistent with training and request Emergency Medical Service (EMS) if necessary.

**Supervisor Notification and CAPRS Reporting Requirements**

**No CAPRS Report Required**.

Unless an injury or alleged injury has occurred, the below listed force does not require a CAPRS report or supervisor notification.

- Escort Holds
- Joint Manipulations
- Nerve Pressure Points (Touch Pressure)
- Handcuffing
- Gun drawing or pointing

**CAPRS Report Required – No Supervisor Notification required.**

The following listed force requires a CAPRS report, but does not require supervisor notification.

- Takedown Techniques
- Chemical Agent Exposures

**CAPRS Report Required - Supervisor Notification Required.**

All other force, injuries or alleged injury incidents require both a CAPRS report and supervisor notification. The sworn employee shall remain on scene and immediately notify a supervisor by phone or radio of the force that was used.

Supervisors shall not conduct a force review on their own use of force. Any other supervisor of any rank shall conduct the force review. (04/16/12)

A CAPRS report entitled "FORCE" shall be completed as soon as practical, but no later than the end of that shift. A supplement describing the use of force incident in detail shall be completed and entered directly into the CAPRS reporting system (no handwritten force reports). Employees shall ensure that all applicable force portions of the CAPRS report are completed in full.

Sworn employees shall complete a CAPRS report entitled "PRIORI" for all incidents in which a person has a prior injury, or prior alleged injury, and there is actual physical contact or transportation by the police.

**Transfer of Custody:** Prior to transferring custody of a subject that force was used upon, sworn MPD employees shall verbally notify the receiving agency or employee of:

- The type of force used,
- Any injuries sustained (real or alleged) and
- Any medical aid / EMS rendered

## 5-307       SUPERVISOR FORCE REVIEW (08/17/07) (12/15/09)

**On-duty Supervisor Responsibilities**

The supervisor who is notified of a Use of Force incident by any sworn MPD employee shall:

1. Determine if the incident meets the criteria for a Critical Incident. If so, follow Critical Incident Policy (P/P 7-810). (09/23/15)

2. Instruct the involved employees to have the subject of the use of force remain on-scene until the supervisor arrives, if it is reasonable to do so.

   - If the subject of the use of force does not remain on-scene, the supervisor shall go to the subject's location, if necessary, to complete the investigation.

3. Respond to the incident scene and conduct a preliminary investigation of the Use of Force incident. (09/23/15)

   a. Debrief the employee(s) who engaged in the use of force.

   b. Note any reported injury (actual or alleged) to any individual involved.

   c. Photograph: (09/23/15)

      - the force subject, including any visible injuries
      - the immediate area of the force event
      - injuries to any other individual involved in the force event
      - damage to equipment or uniforms caused by the force event

   d. Note any medical aid/EMS rendered to any individual involved.

   e. Locate and review any evidence related to the force incident (e.g. MVR, security video, private cameras, etc.). (12/15/09)

   f. Ensure any on-scene evidence is preserved and collected.

   g. Locate and identify witnesses to the use of force incident. (12/15/09)

   h. Obtain statements from witnesses to the use of force incident.

   i. Contact the Internal Affairs Unit Commander immediately by phone if the force used appears to be unreasonable or appears to constitute possible misconduct. (04/16/12)

4. Complete and submit the Supervisor Use of Force Review and Summary in CAPRS as soon as practical, but prior to the end of that shift.

a.  Ensure that all actions taken in the preliminary investigation process and the information obtained from these actions are included in the Summary and that all other relevant information is entered in the appropriate sections of the report. (12/15/09)

b.  If, based upon the totality of the information available at the time of the report, the supervisor feels that the use of force may have been unreasonable or not within policy, the supervisor will: (04/16/12)

- State in the supervisor force review that they believe the use of force requires further review; and
- Notify the commander of Internal Affairs of their findings that the force requires further review.

**5. Review all sworn employees' CAPRS reports and supplements related to the use of force incident for completeness and accuracy.**

## 5-308        NOTIFICATION OF FIREARM DISCHARGES (10/16/02) (04/30/15)

### A. Employee Responsibility

Any employee who discharges a firearm, whether on or off duty, shall make direct contact with their immediate supervisor or the on-duty Watch Commander and the local jurisdiction as soon as possible **except**: (08/17/07) (04/30/15) (04/05/16)

- While at an established target range;
- While conducting authorized ballistics tests;
- When engaged in legally recognized activities while off-duty.

### B. Supervisor Responsibility

1. The supervisor shall respond to any scene in which an employee has discharged a firearm while on-duty or in the course of duty. (04/30/15) (04/05/16)

2. The supervisor is responsible for notifying the Watch Commander and when appropriate, the employee's Deputy Chief and the on-duty Homicide investigator. This does not include the discharge of a firearm with the intention of dispatching an animal, unless it results in injury to a person. (04/30/15) (04/05/16)

3. Notifications to the Internal Affairs Unit shall be made in accordance with the Internal Affairs Call-Out Notification Policy (P/P 2-101). (04/05/16)

4. The advised supervisor shall ensure that drug and alcohol testing is conducted in accordance with the conditions and procedures in the MPD Drug & Alcohol Testing Policy (P/P Section 3-1000). (04/30/15)

City000239

5.  At any officer-involved shooting incident in which a person is shot, the Critical Incident Policy (P/P Section 7-800) shall be followed. (04/30/15)

**C.  Reporting Firearms Discharges to the State (10/16/02) (04/30/15)**

Minn. Stat. §626.553 requires the Chief of Police to report to the StateCommissioner of Public Safety whenever a peace officer discharges a firearm in the course of duty, other than for training purposes or when killing an animal that is sick, injured or dangerous. Written notification of the incident must be filed within 30 days of the incident. The notification shall include information concerning the reason for and circumstances surrounding discharge of the firearm. The Internal Affairs Unit supervisor shall be responsible for filing the required form(s) with the State Bureau of Criminal Apprehension. (04/05/16)

## 5-309      WRITTEN REPORT ON DISCHARGE OF FIREARMS (10/16/02)

All employee firearm discharges that require notification, other than Critical Incidents, shall be reported in CAPRS, including a supplement, by the employee involved and the supervisor who was notified. The report shall be titled, "DISWEAP." The supervisor shall then complete a Supervisor Force Review. (08/17/07)

If the involved employee is unable to make a CAPRS report, the supervisor shall initiate the CAPRS report.

The Watch Commander shall include all case numbers on the Watch Commander log.

## 5-310      USE OF UNAUTHORIZED WEAPONS (10/16/02) (08/17/07)

Sworn MPD employees shall only carry and use MPD approved weapons for which they are currently trained and authorized to use through the MPD Training Unit. If an exigent circumstance exists that poses an imminent threat to the safety of the employee or the public requiring the immediate use an improvised weapon of opportunity, the employee may use the weapon. (08/17/07)

## 5-311      USE OF NECK RESTRAINTS AND CHOKE HOLDS (10/16/02)
##              (08/17/07) (10/01/10) (04/16/12)

**I.    DEFINITIONS**

**Choke Hold:** Deadly force option. Defined as applying direct pressure on a person's trachea or airway (front of the neck), blocking or obstructing the airway (04/16/12)

**Neck Restraint:** Non-deadly force option. Defined as compressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck). Only sworn employees who have received training from the MPD Training Unit are authorized to use neck restraints. The MPD authorizes two types of neck restraints: Conscious Neck Restraint and Unconscious Neck Restraint. (04/16/12)

**Conscious Neck Restraint:** The subject is placed in a neck restraint with intent to control, and not to render the subject unconscious, by only applying light to moderate pressure. (04/16/12)

**Unconscious Neck Restraint:** The subject is placed in a neck restraint with the intention of rendering the person unconscious by applying adequate pressure. (04/16/12)

II.   **PROCEDURES/REGULATIONS**

A.   The Conscious Neck Restraint may be used against a subject who is actively resisting. (04/16/12)

B.   The Unconscious Neck Restraint shall only be applied in the following circumstances: (04/16/12)

1.   On a subject who is exhibiting active aggression, or;

2.   For life saving purposes, or;

3.   On a subject who is exhibiting active resistance in order to gain control of the subject; and if lesser attempts at control have been or would likely be ineffective.

C.   Neck restraints shall not be used against subjects who are passively resisting as defined by policy. (04/16/12)

D.   After Care Guidelines (04/16/12)

1.   After a neck restraint or choke hold has been used on a subject, sworn MPD employees shall keep them under close observation until they are released to medical or other law enforcement personnel.

2.   An officer who has used a neck restraint or choke hold shall inform individuals accepting custody of the subject, that the technique was used on the subject.


**5-312          CIVIL DISTURBANCES (08/17/07)**

Civil disturbances are unique situations that often require special planning and tactics to best bring an unlawful situation under effective control. The on-scene incident commander shall

evaluate the overall situation and determine if it would be a reasonable force option to use less-lethal or non-lethal weapons to best accomplish that objective.

Unless there is an immediate need to protect oneself or another from apparent physical harm, sworn MPD employees shall refrain from deploying any less-lethal or non-lethal weapons upon any individuals involved in a civil disturbance until it has been authorized by the on-scene incident commander.

The riot baton is a less-lethal weapon that shall only be deployed for carry or use during, or in anticipation to, a civil disturbance.

## 5-313       USE OF CHEMICAL AGENTS – POLICY (10/16/02) (08/17/07) (10/01/10) (09/04/12)

The MPD approved chemical agent is considered a non-lethal use of force. The use of chemical agents shall be consistent with current MPD training and MPD policies governing the use of force (Policy and Procedure Manual, Sections 5-300 Use of Force).

Chemical agents, regardless of canister size, shall only be used against subjects under the following circumstances: (06/10/13)

- On subjects who are exhibiting Active Aggression, or;
- For life saving purposes, or;
- On subjects who are exhibiting active resistance in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective, or; (06/10/13)
- During crowd control situations if authorized by a supervisor. (See 5-312 Civil Disturbances) (09/04/12) (06/10/13)

Chemical agents shall not be used against persons who are only displaying Passive Resistance as defined by policy. (09/04/12) (06/10/13)

Sworn MPD employees shall exercise due care to ensure that only intended persons are exposed to the chemical agents.

## 5-313.01    USE OF CHEMICAL AGENTS – POST EXPOSURE TREATMENT/MEDICAL AID (10/01/10)

Post exposure treatment (Medical Aid) for a person that has been exposed to the chemical agent shall include one or more of the following:

- Removing the affected person from the area of exposure.

- Exposing the affected person to fresh air.
- Rinsing the eyes/skin of the affected person with cool water (if available).
- Render medical aid consistent with training and request EMS response for evaluation at anytime if necessary

Sworn employees shall keep a person exposed to the chemical agent under close observation until they are released to medical or other law enforcement personnel. An officer who has used a chemical agent shall inform individuals accepting custody that it was used on the person.

Use of chemical agents to prevent the swallowing of narcotics is prohibited.

A CAPRS report shall be completed when chemical agents are used.

## 5-314        USE OF CONDUCTED ENERGY DEVICES (CED) – DEFINITIONS (08/17/07) (10/01/10)

**Drive Stun:** When a CED with no cartridge or a spent cartridge is placed in direct contact with the body with no documented effort to attempt three point contact.

**Probe Mode:** When a CED is used to fire darts at a person for the purpose of incapacitation.

**Exigent Circumstances:** Circumstances that would cause a reasonable person to believe that immediate action is necessary to prevent physical harm from occurring to anyone.

**Red Dotting:** Un-holstering and pointing a CED at a person and activating the laser aiming device. In some cases, this may be effective at gaining compliance without having to actually discharge a CED. Also known as "painting" the target.

**Arcing:** Un-holstering the CED and removing the cartridge and activating the CED for purposes of threatening its use prior to actual deployment. In some cases, this may be effective at gaining compliance without having to actually discharge a CED at a subject.

## 5-314.01   USE OF CONDUCTED ENERGY DEVICES (CED) – POLICY (10/01/10) (07/16/12)

The MPD approved Conducted Energy Device (CED) (Policy and Procedure Manual, Section 3-200 Equipment) is considered a less-lethal weapon. The use of CED's shall be consistent with current MPD training and MPD policies governing the use of force (Policy and Procedure Manual, Section 5-300 Use of Force). (07/16/12)

MPD officers are only authorized to carry CEDs that are issued by the department. Personally owned Tasers, or those issued by another agency, are not authorized to be carried or utilized while an MPD officer is acting in their official MPD capacity. (10/07/13)
The use of CED's shall only be permitted against subjects under the following circumstances:

1.  On subjects who are exhibiting active aggression, or;

2.  For life saving purposes, or;

3.  On subjects who are exhibiting active resistance in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective.

CED's shall not be used against subjects who are demonstrating passive resistance as defined by policy. (07/16/12)

The preferred method for use of CED's is in the probe mode. Use of CED's in the drive stun mode shall be limited to defensive applications and/or to gain control of a subject who is exhibiting active aggression or exhibiting active resistance if lesser attempts at control have been ineffective.

When using a CED, personnel should use it for one standard cycle (a standard cycle is five seconds) and pause to evaluate the situation to determine if subsequent cycles are necessary. If subsequent cycles are necessary, officers should restrict the number and duration to only the minimum amount necessary to control and/or place the subject in custody under the existing circumstances. Personnel should constantly reassess the need for further activations after each CED cycle and should consider that exposure to multiple applications of the CED for longer than 15 second may increase the risk of serious injury or death.

**Note**: Officers should be aware that a lack of change in a subject's behavior often indicates that the electrical circuit has not been completed or is intermittent. When this is the case officers should immediately reload and fire another cartridge rather than administering continued ineffective cycles.

Unless exigent circumstances exist as defined by policy, no more than one officer should intentionally activate a CED against a subject at one time.

Officers shall, unless it is not feasible to do so, give verbal warnings and/or announce their intention to use a CED prior to actual discharge. Use of the CED's laser pointer (red dotting) or arcing of the CED may be effective at diffusing a situation prior to actual discharge of the CED.

The CED shall be holstered on the sworn MPD employee's weak (support) side to avoid the accidental drawing or firing of their firearm. (SWAT members in tactical gear are exempt from this holstering requirement.)

Lost, damaged or inoperative CED's shall be reported to the CED Coordinator immediately upon the discovery of the loss, damage or inoperative condition. (07/16/12)
Officers who use their MPD issued CED device during the scope of off-duty employment within the City shall follow MPD policy and procedure for reporting the use of force and downloading their device. (07/16/12)

If officers carry their MPD issued CED during the scope of off-duty employment outside of the City (e.g. working for another law enforcement agency) that agency shall sign a waiver (Letter of Agreement for Off Duty Employment) which indicates that certification through the Minneapolis Police Department is sufficient for use while working for that agency. (07/16/12)

## 5-314.02    USE OF CONDUCTED ENERGY DEVICES (CED) – SUBJECT FACTORS (10/01/10)

Officers must consider the possible heightened risk of injury and adverse societal reaction to the use of CED's upon certain individuals. Officers must be able to articulate a correspondingly heightened justification when using a CED upon:

- Persons with known heart conditions, including pacemakers or those known to be in medical crisis;
- Elderly persons or young children;
- Frail persons or persons with very thin statures (i.e., may have thin chest walls);
- Women known to be pregnant;

Prior to using a CED on a subject in flight the following should be considered:

- The severity of the crime at issue;
- Whether the suspect poses an immediate threat to the safety of the officer or others, and;
- The officer has a reasonable belief that use of the CED would not cause significant harm to the subject fleeing unless use of deadly force would otherwise be permitted.

## 5-314.03    USE OF CONDUCTED ENERGY DEVICES (CED) – SITUATIONAL FACTORS (10/01/10)

In the following situations, CED's should **not** be used unless the use of deadly force would otherwise be permitted:

- On persons in elevated positions, who might be at a risk of a dangerous fall;
- On persons operating vehicles or machinery;

- On persons who are already restrained in handcuffs unless necessary to prevent them causing serious bodily injury to themselves or others and if lesser attempts of control have been ineffective.

- On persons who might be in danger of drowning;
- In environments in which combustible vapors and liquids or other flammable substances are present;
- In similar situations involving heightened risk of serious injury or death to the subject.

## 5-314.04   USE OF CONDUCTED ENERGY DEVICES (CED) – DOWNLOADING/REPORTING  (10/01/10) (07/16/12)

Officers are required to report all actual use of their CED consistent with the downloading and reporting guidelines outlined below. (07/16/12)

CED Downloading guidelines:

- The CED (and camera if equipped) shall be downloaded, when used in probe mode or drive stun mode, prior to the end of the officer's shift.
- The CED (and camera if equipped) shall be downloaded for any incident that is recorded that the officer believes might have evidentiary value.
- If a CED was used during a critical incident, the CED will be property inventoried by the Crime Lab for processing video and firing data evidence.

CED Reporting guidelines:

- When a CED is deployed and discharged on a subject, the officer shall report its use in CAPRS (including a Use of Force Report **and** in the supplement) as well as on the officer's CED log. Officers shall document de-escalation attempts in the Use of Force Report **and** in their supplement. (07/16/12)
- When a CED is only threatened by means of displaying, red dotting, and/or arcing in situations which normally would require a CAPRS report, the threatened use shall be reported in CAPRS in the supplement of the report as well as on the officer's CED log. (07/16/12)
- When a CED is only threatened by means of displaying, red dotting, and/or arcing without actually being deployed on a subject and there is no arrest or CAPRS report otherwise required, the officer may record this threatened use on their CED log and add such comments into the call. (07/16/12)
- When a CED is used during the scope of off-duty employment outside of the City (e.g. another law enforcement agency) officers shall obtain a Minneapolis CCN from MECC and complete a CAPRS report titled AOA and refer to their employer's incident report in the

supplement. Officers shall then download the device and store the information under the Minneapolis CCN. (07/16/12)

## 5-314.05    USE OF CONDUCTED ENERGY DEVICES (CED) – POST EXPOSURE TREATMENT/MEDICAL AID (10/01/10)

Post exposure treatment (Medical Aid) for a person that has been exposed to the electricity from the CED shall include the following:

1.  Determine if the subject is injured or requires EMS.

2.  Render medical aid consistent with training and request EMS response for evaluation at anytime if necessary

3.  Request EMS response for probe removal if probes are located in sensitive areas (face, neck, groin or breast areas).

4.  Wear protective gloves and remove probes from the person's non-sensitive body areas.

5.  Secure the probes (biohazard "sharps") point down into the expended cartridge and seal with a safety cover.

6.  When appropriate, visually inspect probe entry sites and/or drive stun locations for signs of injury.

7.  When appropriate, photograph probe entry sites and/or drive stun locations.

Sworn employees shall routinely monitor the medical condition of a person who has been exposed to the electricity from a CED until they are released to medical or other law enforcement personnel and inform individuals accepting custody that a CED was used on the person. (10/01/10)

## 5-315    USE OF IMPACT WEAPONS - POLICY (08/17/07) (10/01/10)

The MPD approved impact weapons (Policy and Procedure Manual, Section 3-200 Equipment) are considered less-lethal weapons. The use of impact weapons shall be consistent with current MPD Training and MPD policies governing the use of force (Policy and Procedure Manual, Section 5-300).

Strikes from impact weapons shall only be administered under the following circumstances:

- On subjects who are exhibiting active aggression, or;
- For life saving purposes, or;

| VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE | 5-300 |
|---|---|
| USE OF FORCE | PAGE 18 OF 28 |

- On subjects who are exhibiting active resistance in order to gain control of a subject and if lesser attempts at control have been or would likely be ineffective.

Strikes from impact weapons shall not be administered to persons who are non-compliant as defined by policy.

## 5-315.01   USE OF IMPACT WEAPONS – TREATMENT/MEDICAL AID (10/01/10)

Treatment (Medical Aid) for a person that has been struck with an impact weapon shall include the following:

- Determine if the person is injured or requires EMS
- When appropriate, visual inspect the areas struck for signs of injury
- Render medical aid consistent with training and request EMS response for evaluation at anytime if necessary

Sworn employees shall routinely monitor the medical condition of a person that has been struck with an impact weapon until they are released to medical or other law enforcement personnel. An officer who has used an impact weapon shall inform individuals accepting custody that it was used on the person. (10/01/10)

## 5-316   MAXIMAL RESTRAINT TECHNIQUE (05/29/02) (06/13/14) (07/13/17) (04/02/18)

(B-C)
### I.   PURPOSE

To establish a policy on the use of "hobble restraint devices" and the method of transporting prisoners who have been handcuffed with a hobble restraint applied.

### II.   POLICY

The hobble restraint device may be used to carry out the Maximal Restraint Technique, consistent with training offered by the Minneapolis Police Department on the use of the Maximal Restraint Technique and the Use of Force Policy.

### III.   DEFINITIONS

**Hobble Restraint Device:** A device that limits the motion of a person by tethering both legs together. Ripp Hobble ™ is the only authorized brand to be used.

City000248

**Maximal Restraint Technique (MRT):** Technique used to secure a subject's feet to their waist in order to prevent the movement of legs and limit the possibility of property damage or injury to him/her or others.

**Prone Position:** For purposes of this policy, the term Prone Position means to lay a restrained subject face down on their chest.

**Side Recovery Position:** Placing a restrained subject on their side in order to reduce pressure on his/her chest and facilitate breathing.

IV.   **RULES/REGULATIONS**

A.   **Maximal Restraint Technique – Use (06/13/14)**

1.   The Maximal Restraint Technique shall only be used in situations where handcuffed subjects are combative and still pose a threat to themselves, officers or others, or could cause significant damage to property if not properly restrained.

2.   Using the hobble restraint device, the MRT is accomplished in the following manner:

a.   One hobble restraint device is placed around the subject's waist.

b.   A second hobble restraint device is placed around the subject's feet.

c.   Connect the hobble restraint device around the feet to the hobble restraint device around the waist in front of the subject.

d.   **Do not** tie the feet of the subject directly to their hands behind their back. This is also known as a hogtie.

3.   A supervisor shall be called to the scene where a subject has been restrained using the MRT to evaluate the manner in which the MRT was applied and to evaluate the method of transport.

B.   **Maximal Restraint Technique – Safety (06/13/14)**

1.   As soon as reasonably possible, any person restrained using the MRT who is in the prone position shall be placed in the following positions based on the type of restraint used:

a.   If the hobble restraint device is used, the person shall be placed in the side recovery position.

2.   When using the MRT, an EMS response should be considered.

City000249

3.  Under no circumstances, shall a subject restrained using the MRT be transported in the prone position.

4.  Officers shall monitor the restrained subject until the arrival of medical personnel, if necessary, or transfer to another agency occurs.

5.  In the event any suspected medical conditions arise prior to transport, officers will notify paramedics and request a medical evaluation of the subject or transport the subject immediately to a hospital.

6.  A prisoner under Maximal Restraint should be transported by a two-officer squad, when feasible. The restrained subject shall be seated upright, unless it is necessary to transport them on their side. The MVR should be activated during transport, when available.

7.  Officers shall also inform the person who takes custody of the subject that the MRT was applied.

**C.  Maximal Restraint Technique – Reporting (06/13/14)**

1.  Anytime the hobble restraint device is used, officers' Use of Force reporting shall document the circumstances requiring the use of the restraint and the technique applied, regardless of whether an injury was incurred.

2.  Supervisors shall complete a Supervisor's Force Review.

3.  When the Maximal Restraint Technique is used, officers' report shall document the following:

- How the MRT was applied, listing the hobble restraint device as the implement used.
- The approximate amount of time the subject was restrained.
- How the subject was transported and the position of the subject.
- Observations of the subject's physical and physiological actions (examples include: significant changes in behavior, consciousness or medical issues).

## 5-317    LESS-LETHAL 40MM LAUNCHER AND IMPACT PROJECTILES (07/16/19)

### I.    PURPOSE

**A.**  The MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that require special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations.

City000250

**B.** This policy addresses the use of the less-lethal 40mm launcher and the 40mm less-lethal round. The deployment of the 40mm launcher is not meant to take the place of deadly force options.

## II.   DEFINITIONS

**40mm Less-Lethal round:** Direct fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject.

## III.   POLICY

**A.** This policy applies to officers who are not working in a certified SWAT capacity.

**B.** The 40mm launcher with the 40mm less-lethal round should not be used in deadly force situations without firearm backup.

1. The use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the suspect's body that are considered unlikely to cause death or serious physical injury.

2. Prior to using less-lethal options, officers need to consider any risks to the public or themselves.

3. When using the 40mm less-lethal round, consideration shall be given as to whether the subject could be controlled by any other reasonable means without unnecessary risk to the subject, officers, or to the public, in accordance with knowledge and training in use of force and MPD policies governing the use of deadly and non-deadly force.

**C.** Only officers trained in the use of the 40mm launcher and 40mm less-lethal round are authorized to carry and use them.

**D.** Officers shall not deploy 40mm launchers for crowd management purposes.

## IV.   PROCEDURES/REGULATIONS

**A.   Standard projectiles**

1. Officers shall only carry MPD-approved 40mm rounds. Ammunition specifications are available from the Range Master.

2. The MPD Range shall issue 40mm rounds with each launcher depending on the needs of the 40mm Operator Program. The MPD Range shall replace any rounds used or damaged as needed.

**B.   Target areas**

1. The primary target areas for the 40mm less-lethal round should be the large muscle groups in the lower extremities including the buttocks, thigh, knees. Alternative target areas include the ribcage area to the waist, and the larger muscle areas of the shoulder areas. Areas to avoid when using the 40mm less-lethal round are the head, neck, spinal cord, groin and kidneys.

2. Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest (in vicinity of the heart). Unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas.

## C. Deployment

1. The 40mm launchers can be used when the incapacitation of a violent or potentially violent subject is desired. The 40mm launcher can be a psychological deterrent and physiological distraction serving as a pain compliance device.

2. If a supervisor or responding officers believe that there is a call or incident that may require the use of less-lethal capability, they may request via radio or other means that an on-duty MPD-trained operator with a 40mm launcher respond to the scene.

3. Officers shall announce over the radio that a 40mm launcher will be used, when time and tactics permit.

    a. It is important that whenever possible, all officers involved and possible responding officers know that a 40mm less-lethal projectile is being deployed so they do not mistake the sight and noise from the deployment as a live ammunition discharge.

    b. 40mm launchers have an orange barrel indicating they are the less-lethal platform.

4. When appropriate given the situation, officers firing a 40mm less-lethal projectile should yell "Code Orange!" prior to and during firing.

## D. Carrying and storage

1. 40mm launchers shall be assigned to each precinct, City Hall and specialty units as needed.

    a. Each 40mm launcher shall be kept its own case and in a secured gun locker.

    b. Only commanders or their designee and MPD-trained operators will have keys to the 40mm armory lockers.

2.  MPD-trained operators shall carry the 40mm launchers during their assigned shift, when available.

**E.  Maintenance of 40mm launchers**

Only MPD certified Range personnel shall perform maintenance and repairs to the 40mm launcher.

**F.  Subjects injured by 40mm less-lethal projectiles**

1.  Medical assistance shall be rendered as necessary in accordance with P&P 5-306 and the Emergency Medical Response policy (P&P 7-350).

2.  If possible, photographs should be taken of any injuries to the suspect.

**G.  Use of Force reporting**

1.  Officers that deploy a 40mm less-lethal round shall report the force in accordance with P&P 5-306, and shall complete a report entitled "FORCE."

2.  Officers who deploy a less-lethal round shall immediately notify dispatch, who will notify a supervisor.

3.  A supervisor shall respond to the scene any time a 40mm less-lethal round is used. The responding supervisor shall review the incident and complete a use of force review in accordance with P&P 5-307.

4.  Supervisors shall ensure that all spent 40mm less-lethal rounds are collected and property inventoried if possible.

# 5-318      REMOTE RESTRAINT DEVICE (10/18/19)

## I.   PURPOSE

**A.**  The MPD recognizes that combative, non-compliant, armed or otherwise violent subjects cause handling and control problems that require special training and equipment.

**B.**  The purpose of a remote restraint device is to facilitate a safe and effective response by immobilizing and controlling resistive or non-compliant persons and persons with known or suspected mental health issues, and minimizing injury to suspects, subjects, and officers.

## II.   DEFINITIONS

City000253

**Remote Restraint Device:** The BolaWrap™ is the only currently authorized remote restraint device. It is a hand-held device that discharges an eight-foot bola style Kevlar tether to entangle an individual at a range of 10-25 feet.

### III.  POLICY

**A.**  The remote restraint device has limitations and restrictions requiring consideration before its use. The device shall only be used when its operator can safely approach the subject within the operational range of the device. Although the device is generally effective in controlling most individuals, officers should be aware that the device may not achieve the intended results and be prepared with other options.

**B.**  The remote restraint device should not be used in potentially deadly force situations without firearm backup.

   1.  When used according to the specifications and training, the device should be considered a low-level use of force.

   2.  Prior to using the device, officers need to consider any risks to the public or themselves

**C.**  Only officers trained in the use of the remote restraint devices are authorized to carry and use them.

**D.**  Officers are only authorized to carry department remote restraint devices while on-duty in a patrol response function.  Officers shall ensure that remote restraint devices are secured at all times.

### IV.  PROCEDURES/REGULATIONS

**A. Standard devices**

Officers shall only carry MPD-approved remote restraint devices, cartridges and cutters. No personally owned remote restraint devices shall be carried or used.

**B. Target areas**

   1.  Reasonable efforts should be made to target lower extremities or lower arms.

   2.  The head, neck, chest and groin shall be avoided.

   3.  If the dynamics of a situation or officer safety do not permit the officer to limit the application of the remote restraint device to a precise target area, officers should monitor the condition of the subject if it strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.

City000254

**C. Deployment**

1. The remote restraint device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:

   a. The subject is violent or is physically resisting.

   b. The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, themselves or others.

2. Remote restraint devices should not be used on individuals who are merely fleeing on foot, without other known and articulable facts or circumstances. Prior to using the device on a subject in flight the following should be considered:

   a. The severity of the crime at issue;

   b. Whether both of the following apply:

      - The subject poses an immediate threat to the safety of the officer or others, and;
      - The officer has a reasonable belief that using the device would not cause significant harm to the subject fleeing unless use of deadly force would otherwise be permitted.

3. The aiming laser shall never be intentionally directed into the eyes of anyone as it may permanently impair their vision.

4. For tactical reasons, the deploying officer should attempt to avoid being the contact officer.

**D. Other deployment considerations**

1. Certain individuals

   The use of the remote restraint device on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes:

   - Individuals who are known to be pregnant.
   - Elderly individuals.

City000255

| VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE | 5-300 |
|---|---|
| USE OF FORCE | PAGE 26 OF 28 |

- Children (known to be or who appear to be under the age of 12).
- Individuals who are handcuffed or otherwise restrained.
- Individuals detained in a police vehicle.
- Individuals in danger of falling or becoming entangled in machinery or heavy equipment, which could result in death or serious bodily injury.
- Individuals near any body of water that may present a drowning risk.
- Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

2. Repeated applications of the device

If the first application of the remote restraint device appears to be ineffective in gaining control of an individual, officers should consider certain factors before additional applications of the device, including:

- Whether the Kevlar cord or barbs are making proper contact.
- Whether the individual has the ability and has been given a reasonable opportunity to comply.
- Whether verbal commands, other options or tactics may be more effective.

3. Dangerous animals

The remote restraint device should not be deployed against an animal as part of a plan to deal with a potentially dangerous animal, such as a dog, etc. This device was not intended for use against animals. However, if the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective the remote restraint device may be deployed to protect against harm to suspects, subjects and officers.

4. Verbal warnings

a. When feasible, officers should air a notification on the radio when arriving at a scene with the intention of using a remote restraint device.

b. When appropriate given the situation, officers discharging a remote restraint device should yell "Bola, Bola, Bola!" prior to and during discharge.

c. Officers shall air a notification on the radio as soon as feasible after discharging a remote restraint device to alert dispatch and other officers that the sound was a device being discharged.

d. The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the officer deploying the remote restraint device in the related report.

**E. Carrying and storage**

1. Officers shall only use department-approved remote restraint devices that have been issued by the Department.

2. Only officers who have successfully completed department-approved training may be authorized to carry and deploy the remote restraint device.

3. All remote restraint devices are clearly and distinctly marked to differentiate them from the duty weapon and any other device.

4. Uniformed and plainclothes officers who have been authorized to carry the remote restraint device shall wear the device in an approved holster on their person or keep the device safely and properly stored in their City vehicle.

5. Officers shall ensure that their remote restraint device is properly maintained and in good working order. Officers shall notify the Training Division of any issues, as the Training Division is in charge of inventory and maintenance of the devices.

6. Officers should not hold both a firearm and the remote restraint device at the same time.

**F. Medical treatment**

1. Medical assistance shall be rendered as necessary in accordance with P&P 5-306 and the Emergency Medical Response policy (P&P 7-350).

   a. Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel:

   - The person is suspected of being under the influence of controlled substances or alcohol.
   - The person may be pregnant.
   - The remote restraint device pellets are lodged in a sensitive area (e.g., groin, female breast, head, face, neck).

2. Officers on scene shall determine whether transporting the person to a medical facility is necessary to remove the pellets or barbs.

3. If officers determine that cutting the tether is reasonable and appropriate, officers may cut the tether at the scene using medical scissors.

**G. Use of Force reporting**

1. Officers that deploy a remote restraint device shall report the force in accordance with P&P 5-306, and shall complete a report entitled "FORCE."

City000257

2.  If a supervisor was not notified prior to deployment, officers who deploy the remote restraint device shall notify a supervisor to respond to the scene.

3.  Officers shall document any injuries or points of contact, with photographs whenever possible.

4.  A supervisor shall respond to the scene any time a remote restraint device is used. The responding supervisor shall review the incident and complete a use of force review in accordance with P&P 5-307.

5.  Supervisors shall ensure that all expended cartridges, pellets, barbs and cord are collected and property inventoried if possible.

**H.  Transport of subjects**

If an officer transports the subject, the transporting officer shall inform any person providing medical care or receiving custody that the individual has been subjected to the application of the remote restraint device.

**I.  BolaWrap™ pilot device form**

1.  In addition to incident and force reporting, deployment of the remote restraint device shall be documented by each discharging officer using the BolaWrap™ Test and Evaluation form. The following information is required on the form:

    - Device and cartridge serial numbers.
    - Date, time and location of the incident.
    - Whether any display or laser deterred a subject and gained compliance.
    - Number of device activations and the duration between activations.
    - Range at which the device was used (as best as can be determined).
    - Locations of impact from any deployments.
    - Whether medical care was provided to the subject.
    - Whether the subject sustained any injuries.
    - Whether any officers sustained any injuries.

2.  The Training Division will periodically analyze the report forms to identify trends, including deterrence and effectiveness.

City000258



| | NUMBER:<br>5-400 |
|---|---|
| **MINNEAPOLIS POLICE DEPARTMENT<br>OPERATIONS SECTION** | DATE:<br>17 DECEMBER 2018 |

**VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE**

**GENERAL FIREARM REQUIREMENTS AND POLICIES**

## 5-401   HANDLING OF FIREARMS (03/11/16) (12/17/18)

**A.** All employees shall safely handle firearms while performing on-duty assignments or while acting in a law enforcement capacity, in a manner consistent with MPD training and policy.

**B.** An employee's finger shall be kept out of the trigger guard and indexed on the frame of the handgun until the employee is on target and intends to fire the gun.

**C.** Employees are responsible for any discharge of a firearm in their custody. Any unintentional, reckless, unlawful, or other discharge inconsistent with MPD training and policy may result in discipline.

## 5-402   MPD ARMORY (11/27/02)

Department-owned armament shall be transferred only through the MPD Rangemaster. Commanders may make temporary loans within the department to meet emergency needs, but the Rangemaster must be notified as soon as practical.

Only those with the rank of Commander and above, the on-duty Watch Commander, the Rangemaster, or those working for the Rangemaster, are authorized to approve access to the MPD Armory. (03/11/16)

Exception: Weapons and other armaments belonging to the Emergency Response Unit (ERU) are excluded from this section. These armaments shall be transferred through the ERU Commander or the ERU Coordinator.

## 5-403   CRITICAL INCIDENTS – LOANER HANDGUN (01/31/02) (02/06/12)

1. Following a Critical Incident, if an involved MPD officer is required to surrender his/her duty handgun, the Homicide Unit will provide a loaner handgun to the involved officer.

2. Prior to returning to duty, the involved officer shall contact the MPD Range during normal business hours to receive a loaner handgun similar to the type of gun the officer has declared as a duty weapon.

3. After receiving the loaner handgun from the Range, the involved officer shall return the loaner gun to the Homicide Unit.

City000259

4. The involved officer will be allowed to carry the Range-issued loaner handgun as a duty handgun until the investigating agency returns the officer's duty handgun.

## 5-404   FIREARMS - CIVILIAN PERSONNEL (01/21/03) (02/06/12)
(C-D)

Civilian personnel are prohibited from handling loaded firearms while at work unless they have attended and completed firearms familiarization training sponsored by the MPD Range or possess a valid permit to carry. Civilian personnel shall not possess personal firearms while at work.

## 5-405   FIREARMS AUTHORIZED FOR OFF-DUTY USE (11/27/02)
(C-D)

The decision to carry a handgun while off-duty is left to the personal preference of each officer. The MPD prohibits any officer from carrying a handgun or ammunition off-duty while using or under the influence of alcohol or drugs.

Officers are permitted to carry off-duty only those handguns they have been certified to carry on-duty. The City of Minneapolis assumes no liability for any officer using a handgun off duty that has not been authorized and approved for on-duty use and for which the Rangemaster has not certified the officer.

## 5-405.01   SECURING FIREARMS OFF-DUTY (11/27/02)
(A-D)

Officers, when off-duty, are responsible for the safe storage of their firearms, whether they are in a motor vehicle, in a residence, or other facility. Officers assume the responsibility for taking reasonable precautions that their firearms do not fall into the hands of minors and/or unauthorized persons.

## 5-406   APPROVAL OF FIREARMS (11/27/02)
(A)

Range personnel must inspect all firearms before an officer may attempt to qualify with the firearm and be authorized to carry the firearm on duty or off duty. Range personnel may require officers to take additional training in addition to shooting a qualification course before allowing an officer to carry a specific firearm.

A firearm shall be resubmitted to the Rangemaster for inspection and approval when:

- Directed by a supervisor;
- The firearm has been altered; and/or

- The firearm has malfunctioned or is not working properly.

## 5-407    MAINTENANCE OF FIREARMS (11/27/02)

(A)
Officers shall maintain their firearm(s) in a clean, serviceable condition.

## 5-408    AMMUNITION (11/27/02) (02/06/12)

(A-B)

1. Officers shall only carry MPD-approved ammunition. Ammunition specifications are available from the Range Master.

2. The MPD will provide the ammunition required for an officer's declared handguns (up to two total). (02/06/12)

3. Ammunition issued for an officer's declared handgun(s) will be replaced annually by the Range Master. (02/06/12)

4. Department shotguns should be loaded with MPD issued 00 Buck. If a situation arises where the spread of the buckshot becomes an issue or additional range or penetration is required shotgun slugs may be used. (02/06/12)

## 5-409    SHOTGUNS (11/27/02) (10/24/03) (02/06/12)

### I.    PURPOSE

To establish procedure for the use of Remington, Model 870 shotguns.

### II.    DEFINITIONS

**Squad Ready:** The shotgun shall have six rounds in the magazine with the hammer dropped (trigger pulled). There shall be no round in the chamber and the safety shall be in the "fire position." The shotgun shall have a single strip of masking tape around the barrel and fore-grip with the preparing officer's initials, date and time written on the tape. (10/5/09) (02/06/12)

### III.    PROCEDURE / REGULATIONS

A. The Remington, Model 870 shotgun is the authorized MPD shotgun. (02/06/12)

B. All sworn personnel shall qualify and attend annual shotgun training, and shall retain annual shotgun certification. (12/18/06) (02/06/12)

C. The shotgun shall be "squad ready" when in a vehicle. (12/18/06) (02/06/12)

1. At the start of a shift, uniformed officers assigned to a marked squad shall obtain a shotgun, inspect it and ensure the shotgun is set up squad ready. (02/06/12)

2. Upon completion of their shift, officer(s) shall remove the shotgun from the squad car for storage in the precinct or unit armory. When stored, the Remington, Model 870 shotgun shall have the slide open with no rounds in the weapon. (12/18/06)

## 5-410        RIFLES (03/31/06) (04/23/10) (08/01/11) (09/04/12)

**I.    PURPOSE**

To establish policy and procedure for the use of Colt M-4, Colt M-16 A-1 and Smith & Wesson M&P 15X rifles. (08/01/11)

**II.   POLICY**

Officers certified to carry the Colt M-4, Colt M-16 A-1 or Smith & Wesson (S&W) M&P 15X rifles are authorized to do so as part of their regular duty assignment. When deploying a rifle officers shall adhere to the United States and Minnesota Constitutions, and to all state and federal laws and MPD policies pertaining to the use of deadly force. (08/01/11) (09/04/12)

**III.  DEFINITIONS**

**Squad Ready:** The rifle's bolt is forward on an empty chamber with the safety on. The rifle shall have a 20 round magazine loaded with 18 rounds of issued duty ammunition inserted into the magazine well. If an officer chooses to use 30 round magazines the magazine shall be loaded with 28 rounds of issued duty ammunition. (08/01/11)

**Authorized Magazines:** Only magazines issued by the Range or brands of magazines approved by the Range shall be used. A list of approved magazines will be maintained at the Range. (08/01/11)

**IV.  PROCEDURE / REGULATIONS**

A. Certified Rifle Operators shall attend annual training and pass a qualification course to retain their certification. The certification course will be determined by the Range Master.

B. Officers assigned to the Rifle Program may carry a department issued Colt M-16 A-1 rifle or purchase a Colt M-4 or S&W M&P 15X rifle to carry on patrol. (08/01/11) (09/04/12)

1. Officers who elect to carry department issued Colt M-16 A-1 rifles will carry the rifle in the same condition as it was issued. Officers shall not add accessories to the rifle or alter it in any way. (08/01/11)

    2.  Officers who elect to purchase a Colt M-4 or S&W M&P 15X rifle may only add accessories authorized by the MPD Range Master to the rifle. A list of these accessories will be maintained at the Range. (08/01/11) (09/04/12)

C.  Any officer currently in the Rifle Program who has purchased his/her own S&W M&P 15X patrol rifle shall sign a Rifle Program Duty Declaration Form (MP-9068) which outlines the rules associated with carrying the rifle. This form shall be signed before a personally owned rifle may be used on patrol. The Rifle Program Duty Declaration Form will be maintained by the Range in the officer's file. (08/01/11)

D.  Approved Colt M-4, Colt M-16 A-1 and S&W M&P 15X rifle use in vehicles. (08/01/11) (09/04/12)

    1.  Rifles shall be "squad ready" when in a vehicle.

    2.  Rifles shall be transported in one of two ways as follows:

        a.  In a squad mounted lock in the front passenger compartment of the vehicle, or

        b.  Cased in the trunk of the vehicle. If the rifle is cased in the vehicle's trunk it may be brought into the cabin of the vehicle prior to arriving on a call that will require use of the rifle.

    3.  At the end of an officer's shift the rifle shall be unloaded, cased and locked in the officer's locker.

E.  Deployment of Colt M-4, Colt M-16 A-1 or S&W M&P 15X rifles. (08/01/11) (09/04/12)

    1.  Rifles may be deployed in the following situations:

        a.  When a suspect is out of range for a shotgun or handgun to be effective.

        b.  Suspects are reasonably believed to be wearing protective body armor.

        c.  Situations that an officer reasonably believes to meet active shooter criteria.

        d.  When the unique features of the Colt M-4, Colt M-16 A-1 or S&W M&P 15X rifles provide a tactical advantage. (08/01/11) (09/04/12)

    2.  Colt M-4, Colt M-16 A-1 or S&W M&P 15X rifles should not be used or brought into buildings. (08/01/11) (09/04/12)

      a. Notwithstanding the above, it may be necessary to use a rifle in a building if the call involves an active shooter, a suspect wearing protective body armor or other serious situations.

      b. Officers should be aware that serious damage may occur to their hearing or the hearing of others in close proximity to the area if a rifle is fired in a building.

      c. Officers should be aware of the area behind their intended target if they need to fire their rifles in an urban area.

    3. When officers respond to a call where MPD policy requires that a CAPRS report be completed, officers shall document the deployment or use of the Colt M-4, Colt M-16 A-1 or S&W M&P 15X rifle in their statement. (08/01/11) (09/04/12)

F. A certified Colt M-4, Colt M-16 A-1 or S&W M&P 15X rifle operator who has used his or her rifle in violation of this policy or in an unsafe manner may be removed from the Rifle Program. (08/01/11) (09/04/12)

G. Failure to attend a scheduled rifle training session may result in removal from the Rifle Program.


## 5-411        FIREARMS TRAINING REQUIREMENTS (11/27/02)

(A-D)

The Rangemaster is responsible for planning, implementing and conducting firearms training for all MPD sworn personnel. The Rangemaster is also responsible for operational activities of all sworn personnel and for ensuring that all personnel comply with the established policies, procedures and orders of the department. The Rangemaster reviews all officer-involved shootings for future or immediate training needs.

Range officers instruct sworn personnel in the proper use of authorized individual and MPD-owned firearms. They also are responsible for inspecting and determining the functional operation of firearms.

All sworn personnel are required, as a term and condition of employment, to obtain a "passing" score on the MPD-approved course of fire for each of the Range training periods established by the Training Unit. They must do so with their primary handgun and secondary handgun (if they intend to carry one).

Officers may be required to participate in additional firearms training at the discretion of the Training Unit as approved by the Administration.

Sworn personnel are also required to satisfactorily complete each course of fire with MPD-issued shotguns as conducted by Range personnel.

City000264

Any officer who fails to attend the MPD-approved course of fire for any given range training period because of a medically documented illness, temporary injury, IOD-related matter or non-medical excused absence from duty (i.e., LOA), will be required to do so upon their return to full duty. Officers returning to full duty shall be reassigned to a non-enforcement position by their Commander and will not be authorized to carry a firearm, on or off duty, until successfully completing the required course of fire.

Recruit officers must attain the minimum score required to "pass" the firearms qualification course conducted by MPD Range personnel. Failure to qualify is cause for termination of employment.

## 5-411.01     FAILURE TO QUALIFY (11/27/02)
(A-D)

"To Qualify" means obtaining the minimum passing score on any given MPD-approved course of fire with handguns, shotguns and other specialty firearms if required.

Officers who do not obtain a "passing" score on a required course of fire shall be given a "Notice of Failure to Qualify." This form will direct the officer to return on a given date and time for remedial training and/or refiring of the course. A copy of the "Notice of Failure to Qualify" (MP-6454) will be sent to the officer's Commander and another placed in the officer's Range file.

The Commander will immediately reassign the officer to a non-enforcement position until such time as he or she returns to the range and "passes" the course of fire. The officer is also prohibited from carrying or using MPD-authorized firearms, on or off duty, until satisfactory completion of the course.

Failure to qualify after remedial training may be cause for disciplinary action up to and including termination of employment.

## 5-411.02     FAILURE TO ATTEND FIREARMS TRAINING (11/27/02)
(A-B)

Commanders will be allocated sufficient range time to schedule all their officers for each required range training period. Make-up sessions may be scheduled if necessary.

Upon the completion of each firearms qualification period, officers who did not attend will be issued a "Notice of Failure to Attend Firearms Qualification Course" (MP-6453). A copy will be sent to the officer's Commander and a copy placed in the officer's Range file. The officer shall report to the Range on the specified date and time for remedial training and/or qualification.

Commanders will immediately reassign the officer to a non-enforcement position until such time as he or she returns to the Range and satisfactorily completes the course of fire. The officer is also prohibited from carrying or using MPD-authorized firearms, on or off duty, until satisfactory completion of the course.

A list of all officers who failed to report for firearms training during each qualification period will be forwarded to their respective Bureau Head. Failure to attend required firearms training, unless properly excused, will be cause for disciplinary action up to and including termination of employment.

## 5-412        USE OF DEPARTMENT RANGE FACILITY (11/27/02)
(A)

The MPD Range facility may only be used by sworn law enforcement personnel or persons authorized by the Rangemaster. Sworn law enforcement personnel from agencies other than the MPD may be permitted to use the Range facility with the prior approval of the Chief of Police. In these instances, at least one Range staff officer must be present to monitor the use of the facility.

Only MPD-authorized ammunition and an officer's primary and secondary firearm may be used at an MPD Range facility.

## 5-412.01      RANGE RULES - INDOOR AND OUTDOOR (11/27/02)
(A-B)

The Rangemaster is the Commander of the MPD's Range facilities. The following rules shall be adhered to by all personnel using the indoor or outdoor range facilities:

- All weapons at the range should be treated as if they are loaded. (02/06/12)
- Weapons shall be cased or holstered unless directed to do otherwise by the Rangemaster.
- Trigger fingers will remain off the trigger until the Rangemaster gives the command to shoot.
- Handling of weapons will be on command or by permission of range personnel only.
- No handling of weapons will be permitted while persons are down range.
- Possession and/or consumption of liquor or drugs is forbidden either immediately prior to or while at the range.
- The Rangemaster may order anyone using the MPD's Range to leave a Range facility for the violation of any of his/her commands or rules.
- The Rangemaster may temporarily confiscate the weapon of any employee of the MPD pending a decision on the issue by the Chief of Police.

## 5-413        DEPOSITING WEAPONS AT JAIL OR PROCESSING FACILITY (11/27/02)
(A-B)

Officers entering any area of a jail or processing facility shall follow all rules of the controlling agency as to the deposit of weapons immediately upon entering the facility.

City000266



| MINNEAPOLIS POLICE DEPARTMENT OPERATIONS SECTION | NUMBER:<br>5-500 |
|---|---|
| | DATE:<br>22 JULY 2016 |

| **VOLUME FIVE - CODE OF CONDUCT AND USE OF FORCE** |
|---|
| **SPECIALTY UNIT PROCEDURES** |

## 5-501    INTRODUCTION/PURPOSE  (08/16/07)

This section outlines procedures that may be utilized by MPD Specialty Units. Units include but are not limited to Special Weapons and Tactics (SWAT).

## 5-502    CHEMICAL MUNITIONS (10/16/02)

Chemical munitions shall only be used by trained Special Weapons and Tactics (SWAT) personnel on the orders of the on-duty Watch Commander or SWAT Commander. (08/16/07)

When chemical munitions are used, the Fire Department and an ambulance will be on standby at a safe distance near the target area. After the scene is secured, SWAT team members shall remove and dispose of any canisters in the area. (8/16/07)

## 5-503    DIVERSIONARY/DISTRACTION DEVICES (10/16/02)

Diversionary/Distraction devices will only be distributed by and used under the authority of the SWAT Commander or designee, who will make a decision about the use of such a device on a case by case basis. Diversionary/distraction devices shall be MPD approved. The SWAT Commander or designee shall distribute and supervise the use of the devices. (08/16/07)

Only personnel trained in the use of these devices shall deploy them. Department approved training shall include the nomenclature, mechanical operation, and tactical deployment of Diversionary/Distraction devices. All members of SWAT shall also be trained by the Minneapolis Fire Department in the use of dry chemical fire extinguishers. Emphasis will be placed upon safety considerations/measures to be utilized when using these tools. (08/16/07)

When the device is used, one member of the entry team shall carry a dry chemical extinguisher for use in the event of a fire.

## 5-504    MPD COMMUNITY CHAPLAIN PROGRAM (07/21/16)

## I.  PURPOSE

**A.** The MPD Community Chaplain Program consists of Minneapolis clergy and faith community leaders, representing a variety of cultures and faith traditions. Their mission is to provide spiritual care and support services to members of the Minneapolis Police Department and to the citizens of Minneapolis in their times of need.

**B.** The positive relationships established through quality spiritual care relationships, create opportunities for building strong connections between the Minneapolis Police Department and the citizens of Minneapolis. These positive police/community connections are valuable components of: a healthy police department, healthy communities and ultimately a strong and healthy Minneapolis.

## II.  POLICY

MPD Chaplains utilize an inter-faith ministry of presence, service and relationships to carry out their critical mission. As representatives of the Minneapolis Police Department and of the faith communities they have been called to lead, MPD Chaplains will carry out their duties to the highest standards of professionalism (See ICPC Canon of Ethics for Law Enforcement Chaplains).

## III.  PROCEDURES/ REGULATIONS

### A.  MPD Chaplain Spiritual Care and Support Responsibilities

1. Chaplains provide *proactive* spiritual care by being present with police personnel and community members in times of calm and in everyday, routine activities. This presence creates opportunities to build strong personal relationships with individuals within their personal context of community. Examples of these activities include, but are not limited to:

   - Precinct Roll Call
   - Chaplain Precinct Time
   - Officer Ride-Alongs
   - Department Meetings
   - Department Ceremonies
   - Neighborhood Meetings
   - Community Events
   - Community Celebrations

City000268

- Community Outreach Activities

2. Chaplains provide *reactive* spiritual care by responding to critical incidents with MPD staff (in a support role) and providing care services to those who are suffering and in need. Examples of these activities include, but are not limited to:

- Death/critical injury scene response
- Death Notifications at the direction of the MPD Chaplain Coordinator (07/22/16)
- Faith Community call response
- Major crime scene response
- Traumatized victim response
- Personal care/support of MPD staff
- Any situation where a Chaplain's calm and non-anxious presence would be helpful

**B. MPD Chaplain Program Supervision and Direction**

1. The MPD Community Chaplain Program is overseen by the Assistant Chief, who may assign supervision and direction to an MPD Commander or other designee.

2. Community Chaplain Program operations will be directed by the MPD Chaplain Coordinator. (07/22/16)

3. Individual Chaplain supervision and direction will be assigned to Precinct Inspectors and Inspector designees.

City000269