UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Desmond Gilbert, | Case No. 21-CV-02350 (JMB/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| City of Minneapolis, Minneapolis Police Officers Christopher Kelley, Evan Komarek, and Joseph Foxley, *in their individual and official capacities*, | |
| Defendants. | |

---

Lucas J. Kaster and Matthew H. Morgan, Nichols Kaster, PLLP, Minneapolis, MN, for Plaintiff Desmond Gilbert.

Heather P. Robertson, Kristin R. Sarff, Sharda R. Enslin, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendants City of Minneapolis, Minneapolis Police Officers Christopher Kelley, Evan Komarek, and Joseph Foxley, *in their individual and official capacities*.

---

Plaintiff Desmond Gilbert brings this civil rights action under 42 U.S.C. § 1983 against three Minneapolis Police Officers: Christopher Kelley, Evan Komarek, and Joseph Foxley (the Officer Defendants) and the City of Minneapolis (the City). Gilbert alleges that the Officer Defendants used excessive force in violation of the Fourth Amendment when they arrested him on October 29, 2019. Gilbert also asserts municipal liability claims against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *City of Canton v. Harris*, 489 U.S. 378 (1989). Gilbert now moves for summary judgment

1

on his municipal liability claims (Counts II and III).  (Doc. No. 35.)  For the reasons set forth below, the Court denies Gilbert's motion.

## BACKGROUND

The facts underlying Gilbert's section 1983 claims are largely disputed by the parties.  The facts relevant to resolving Gilbert's motion, when viewed in the light most favorable to the City as the non-moving party, are summarized below.

### A.     Gilbert's Arrest

On the evening of October 29, 2019, an anonymous caller called 911 to report "a lot of yelling coming from next door" and noted the noise was possibly coming from the second or third floor of an apartment complex nearby.  (Doc. No. 40 at 3; Doc. No. 68-2B.) Three police officers, Officer Michael Kennedy, Officer Joel Hagen, and Sergeant Jamy Schwartz, responded to the call.  (Doc. No. 41 at 18, 20, 23.)  Upon arrival to the scene, the officers heard yelling coming from the Passage Apartments.  (Doc. No. 68-4 at 28 (filed under seal); Doc. No. 68-3 at 33–34 (filed under seal); Doc. No. 39-11 at 61:17–62:7.)  The officers entered the apartment complex and walked through the building to determine where the sound was coming from.  (Doc. No. 68-4 at 29 (filed under seal); Doc. No. 68-3 at 37–38 (filed under seal); Doc. No. 39-11 at 68:11–69:1.)  The officers located the apartment where the noise was coming from and knocked on the door.  (Doc. No. 68-4 at 31–32 (filed under seal); Doc. No. 68-3 at 37–39 (filed under seal); Doc. No. 39-11 at 68:11–69:9.)

A woman, Michelle Adams, answered the door.  (Doc. No. 39-1 at 70:14–25, 89:16–20; Doc. No. 39-5 at 00:43.)  A man, Emmanuel Culver, stood behind Adams as she spoke

2

with the officers. (Doc. No. 39-5 at 00:43–01:03.) Officer Kennedy entered the threshold of the apartment. (*Id.* at 1:00–1:04.) Culver objected to Officer Kennedy's entry into the apartment and asked if the officers had a search warrant. (*Id.*) Officer Kennedy brought Culver out into the hallway of the apartment building to secure him against a hallway wall. (*Id.* at 1:04–1:44.)

Shortly thereafter, Adams, Gilbert, and Keona Carter all entered the hallway from the apartment. (Doc. No. 39-4 at 4:45–58.) Adams and Carter yelled at the officers. (*Id.*) Adams began recording the officers. (*Id.* at 5:42.) Gilbert left the hallway and re-entered the apartment. (*Id.*) Gilbert came back into the hallway and spoke with Sergeant Schwartz. (*Id.* at 5:40–44.) An "officer needs help" call was sent out by dispatch or inadvertently generated by one of the three officers' radios around this time, and the Officer Defendants responded to that call. (Doc. No. 68-3 at 51 (filed under seal); Doc. No. 68-4 at 148 (filed under seal); Doc. No. 39-11 at 70:8–9.)

Officer Kelley pulled Gilbert away from the scene and used an armbar across Gilbert's chest to pin him against the wall. (Doc. No. 39-7 at 1:16; Doc. No. 39-4 at 6:14; Doc. No. 68-2E at 2:05; Doc. No. 39-12 at 1:49; Doc. No. 41 at 16.) Moments later, Officer Kelley deployed chemical irritant, or mace, onto Gilbert's face. (Doc. No. 39-7 at 1:17–1:19; Doc. No. 41 at 16.) Officers Komarek and Foxley then took Gilbert to the ground and placed him into the prone position. (Doc. No. 39-13 at 2:05–2:15.) Officer Komarek then used his knee to pin Gilbert's head to the ground. (Doc. No. 39-13 at 2:10; Doc. No. 41 at 15.) Simultaneously, Officer Foxley used his knee to pin Gilbert's lower back to the ground and handcuffed him. (Doc. No. 39-12 at 1:49–2:15.) The Officers' body worn

3

camera footage[1] shows that Gilbert began to convulse. (Doc. No. 39-12 at 2:35–4:50.) Gilbert says that, at this time, he had a seizure. (Doc. No. 37 at 14.) The City, however, characterizes Gilbert's movements as "thrashing." (Doc. No. 70 at 25.) Officers requested Emergency Medical Services (EMS). (Doc. No. 39-12 at 3:30.) EMS arrived and took Gilbert to the hospital, where he spent the night. (*Id.* at 15:30; Doc. No. 39-19 at 127:3–10.) Gilbert was put on concussion protocol and later received treatment for a slanted pelvis. (Doc. No. 39-19 at 129:17–20, 144:2–14:1.) Gilbert also suffered night terrors following the incident. (*Id.* at 145:4–11.)

  B. **The Investigations and Reports of the Minnesota Department of Human Rights and the United States Department of Justice**

After the killing of George Floyd in May 2020—and after Gilbert's October 2019 arrest—both the Minnesota Department of Human Rights (MDHR) and the United States Department of Justice (DOJ) launched pattern or practice investigations of the Minneapolis Police Department (MPD).[2] (*See* Doc. No. 39-15 [hereinafter, "MDHR Report"] at 6; Doc. No. 39-16 [hereinafter, "DOJ Report"] at 5.) The MDHR published its report on April 27, 2022 (MDHR Report), based on a review of the time period from January 2010 through December 2020. (MDHR Report at 2, 12.) The MDHR found that "there is probable cause

---

[1] Officer Kelley's body worn camera appears to have only recorded the events that took place after Gilbert was taken to the ground by Officers Komarek and Foxley. (*See* Doc. No. 68-2J.)

[2] The MDHR initiated its investigation under the pattern-or-practice provision of the Minnesota Human Rights Act, Minn. Stat. § 363A.12. (*See* MDHR Report at 6.) The DOJ initiated its investigation under the pattern-or-practice provision of the Violent Crime Control and Enforcement Act of 1994, 42 U.S.C. § 14141. (*See* DOJ Report at 11.)

4

that the City and MPD engage in a pattern or practice of race discrimination in violation of the Minnesota Human Rights Act." (*Id.* at 9.)  Specifically, the MDHR Report found that MPD engages in a pattern or practice of discriminatory policing as shown by racial disparities in how MPD officers use force against, stop, search, and arrest Black individuals. (*Id.*)

The DOJ published its report on June 16, 2023, based on a review of the time period from January 2016 through August 2022. (DOJ Report at 2, 11.)  The DOJ Report found that the DOJ "has reasonable cause to believe that the City of Minneapolis and the Minneapolis Police Department engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law." (*Id.* at 5.)  Specifically, the DOJ found that MPD uses excessive force, including unjustified deadly force and other types of force and that the MPD unlawfully discriminates against Black people in its enforcement activities. (*Id.*)

**C.     This Action**

On October 21, 2021, Gilbert filed a three-count Complaint against the City of Minneapolis and the Officer Defendants under section 1983. (Doc. No. 1 [hereinafter, "Compl."].)  In Count I, Gilbert alleges that the Officer Defendants used excessive force when arresting him, thereby depriving him of his civil rights in violation of the Fourth Amendment. (Compl. ¶¶ 94–102.)  In Counts II and III, Gilbert alleges that the City is liable for the Officer Defendants' unconstitutional conduct. (*Id.* ¶¶ 103–113.)

To address Gilbert's motion, the Court must first determine the type of municipal liability pleaded in each count.  To be clear, a municipality may be liable under section

5

1983 if any of the following occurs: (1) an official municipal policy violates the constitution; (2) an authorized municipal representative directs another employee to take unconstitutional action; (3) an unwritten custom, that violates the constitution, is so widespread that it has the force of law; and (4) the municipality fails to train or supervise municipal employees. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell* for the proposition that a municipality may be liable under section 1983 if the constitutional violation resulted from "an official municipal policy" or "an unofficial custom," and citing *Canton* for the proposition that a municipality may be liable if the constitutional violation resulted from "a deliberately indifferent failure to train or supervise") (quotations omitted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (explaining that a municipality may be liable under section 1983 if an authorized decisionmaker directed a particular unconstitutional course of action that resulted in the complained-of injury).

Counts II and III include overlapping and repetitive language, with both counts referring to municipal liability on the basis of an unwritten custom and on the basis of a failure to train. (Compl. ¶¶ 104, 105, 110, 111.) For purposes of the instant motion, the Court construes Count II as asserting a section 1983 claim of municipal liability pursuant to *Monell* on the basis that the City maintained an unwritten custom of using excessive force.[3] The Court construes Count III as asserting a section 1983 claim of municipal

---

[3] The Court cannot construe Count II as raising an "official policy" variety of *Monell* liability because there is no allegation identifying any official policy that violated the constitution. Likewise, the Court does not construe Count II as raising the *Pembaur* variety of *Monell* liability because there is no allegation that any authorized City representative

6

liability pursuant to *Canton* on the basis that the City failed to adequately train or supervise its employees, including the Officer Defendants, in avoiding the use of excessive force and unlawful restraint maneuvers.[4]

## DISCUSSION

Gilbert now moves for summary judgment on Counts II and III.[5] In response, the City argues that the record includes questions of fact. The Court concludes, as explained

---

directed an employee to take the allegedly unconstitutional action that resulted in Gilbert's injuries.

In his briefs, Gilbert appears to argue that summary judgment is warranted because the City maintained an official policy that permitted officers to utilize head and neck restraints and an unwritten custom of aggression instead of de-escalation. In Counts II and III of his Complaint, however, Gilbert does not allege these things as official policies or unwritten customs. Evidence of policies or customs concerning neck restraints and de-escalation could support Gilbert's more general claims that the City maintained an unofficial custom of using excessive force and that the City failed to train police officers to avoid the use of excessive force and unlawful restraint maneuvers, but the Court cannot agree with Gilbert that summary judgment is proper based on a specific policy or custom that Gilbert identified in his argument but did not specifically mention in the language of either Count II or Count III. In addition, disputed factual issues remain as to whether Gilbert was ever subject to a neck restraint and as to the adequacy of the training provided. *Atkinson*, 709 F.3d at 1216 (noting that absent a facially unlawful policy, plaintiff's claims are analyzed under the deliberate indifference analysis).

[4] The Court construes Count III in this way because the allegations are narrowly tied to failure to train and supervise MPD officers to avoid the use of excessive force and unlawful restraint maneuvers. The language used in the Complaint does not raise an "unwritten custom" variety of *Monell* liability because any allegations that are consistent with that claim are repetitive of, and subsumed by, the claim raised in Count II. Moreover, the language used in Count III does not raise either an "official policy" or *Pembaur* variety of *Monell* liability.

[5] The City argues that the motion is premature because Gilbert must prove the constitutional violation in Count I in order for the City to be liable. In his reply brief, Gilbert concedes that the City is correct: establishing Count I is an essential element of the claims of municipal liability raised in Counts II and III. *See Schoettle v. Jefferson Cnty.*, 788 F.3d 855, 861–62 (8th Cir. 2015) (stating that a municipality cannot be held liable under *Monell*

7

below, that there remain genuine disputes of material fact as to both counts, precluding entry of summary judgment.[6]

As a threshold matter, the Court reiterates the well-established standard that applies to Gilbert's motion. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

---

where there is no underlying constitutional violation). Gilbert also concedes that summary judgment is precluded by questions of fact concerning the elements of Count I. Gilbert asks this Court to presume he has proven Count I, and to rule on the summary judgment motion in a manner akin to entering a directed verdict on the second phase of a two-part bifurcated trial. The Court assumes without deciding that Gilbert can prevail at trial on Count I and declines to deny the motion as premature.

[6] The City also asks the Court to conclude that the Officer Defendants are entitled to qualified immunity and, on that basis, deny Gilbert's summary judgment motion. (*See* Doc. No. 70.) However, the City made no dispositive motion of its own on this basis, and it cited to no authority that supports the proposition that the Court may decide qualified immunity absent a dispositive motion to do so. Instead, the City relies on authority that suggests the opposite. *See Payne v. Britten*, 749 F.3d 697, 702 (8th Cir. 2014) (noting that defendants are entitled to "a reasoned denial or grant of their claim of qualified immunity" at any permissible stage of the proceedings in "*which a proper motion is filed*." (emphasis added)); *Hunter v. Bryant*, 502 U.S. 224, 226 (1991) (analyzing agent's motion for summary judgment on qualified immunity grounds); *see also Lampkins v. Thompson*, 337 F.3d 1009, 1014 (8th Cir. 2003) ("Although procedurally unusual, the qualified immunity defense is not waived or lost if a case proceeds to trial."). The Court declines to address qualified immunity at this time.

in their favor. *Id.* at 255. Further, on a motion for summary judgment, "the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008).

**I.      Count II**

Gilbert argues that he is entitled to summary judgment on Count II because the record evidence demonstrates that the City[7] maintained a widespread custom of using excessive force. To prevail on his motion for summary judgment, Gilbert must demonstrate that the undisputed record evidence establishes each of the following elements of his claim: (1) the existence of a pattern of unconstitutional misconduct by the municipality's employees that is continuing, persistent, and so widespread that it has the effect of law; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice to the officials of that misconduct; and (3) that the plaintiff was injured by acts pursuant to the municipality's custom, i.e., that the custom was a moving force behind the constitutional violation. *Meier v. City of St. Louis*,

---

[7] It is well established that police departments are not entities subject to liability under section 1983, and the Court construes the Complaint to assert that the City had an unofficial custom of using excessive force. *See Ketchum v. City of W. Memphis*, 974 F.2d 81, 82 (8th Cir. 1992); *see also De La Garza v. Kandiyohi Cnty. Jail, Corr. Inst.*, 18 F. Appx 436, 437 (8th Cir. 2001) (per curiam) (noting that a county jail and county sheriff's department were not legal entities subject to suit under section 1983 and quoting *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit.")). Similarly, Gilbert's claims against the Officer Defendants in their official capacities are analyzed as claims against the City. *See Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020) (stating section 1983 claims against municipal officials in their official capacities are treated as claims against the municipality).

78 F.4th 1052, 1057–58 (8th Cir. 2023). The record presented here contains genuine issues of material fact regarding all three elements of the *Monell* claim raised in Count II.

Gilbert argues that the DOJ Report and the MDHR Report establish, beyond dispute, the first element of Count II.[8] (*E.g.*, MDHR Report at 45 (concluding that "[b]y teaching an approach to policing that emphasizes aggression, MPD creates a culture that results in unnecessary escalation and/or excessive force during encounters with community members"); DOJ Report at 14, 15 (concluding that "MPD officers routinely use excessive force, often when no force is necessary" and that the "MPD's pattern or practice of using excessive force violates the law").) Gilbert also emphasizes a March 29, 2019 citizen complaint alleging numerous policy violations against Officer Kelley, including that Officer Kelley told the complainant, "If you report me, I don't care; go ahead, nothing will happen." (Doc. No. 50 at 2.)

This record evidence, however, is disputed by the City, precluding summary judgment of Count II. *See, e.g.*, *Anderson*, 477 U.S. at 255 ("Credibility determinations,

---

[8] In its briefing, the City notes that it intends to seek exclusion of both the MDHR Report and DOJ Report at trial. (Doc. No. 70 at 53 n.12.) However, the City does not expressly request that the Court strike the MDHR Report and DOJ Report or otherwise refrain from considering the reports when resolving the pending motion for summary judgment. The Court observes that the reports contain hearsay statements but acknowledges that Federal Rule of Evidence 803(8)(A)(iii) provides an exception to the rule against hearsay for "[a] record or statement of a public office if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). Absent a request to strike the reports, and because the City makes no argument that the reports did not result from legally authorized investigations, the Court concludes that, for the purposes of summary judgment, the evidence relied upon by Gilbert is properly before this Court. At this time, the Court does not address the admissibility of the reports at trial.

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."). The Court concludes that a genuine issue of material fact exists regarding the factual statements in the reports, the extent to which the facts of this case are similar to the fact patterns summarized in the reports, and the weight to be given to the reports, which both assessed police conduct that post-dates the incident in question. Moreover, the City contests Gilbert's characterization of MPD training and emphasizes written policies discouraging the use of excessive force. (*E.g.*, Doc. No. 39-18 [hereinafter, "MPD Policy"] at 84 ("MPD is committed to unbiased policing" and "[n]o person shall be singled out or treated differently as a consequence of his/her race"); *Id.* at 94 ("sworn MPD employees shall only use the amount of force that is objectively reasonable"); *Id.* at 97 ("officers shall use de-escalation tactics"). Given the conflicting evidence in the record, the Court cannot conclude that, as a matter of law, MPD had an unwritten custom of using excessive force that became so widespread it had the effect and force of law. *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) ("[I]n the face of an express municipal policy prohibiting excessive force, two incidents of excessive force—even assumed to be true—cannot be considered a pattern of widespread and pervasive unconstitutional conduct."); *but see Ware v. Jackson Cnty.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").

Gilbert also argues that reasonable jurors would necessarily find in his favor on the second element of Count II: that the City either showed deliberate indifference toward or tacitly authorized the wrongful conduct after being put on notice of it. Notice is the

touchstone of deliberate indifference in the context of section 1983 municipal liability, *Atkinson*, 709 F.3d at 1216, and Gilbert argues that the City received sufficient constructive notice for the following two reasons: (1) the reports reviewed complaints of excessive force spanning a long period of time; and (2) the DOJ Report referenced findings of racial disparities in the use of force in a 2018 Hennepin County Public Defender report and a 2015 ACLU report. (Doc. No. 37 at 46–47; DOJ Report at 46).

The Court concludes, contrary to Gilbert's argument, that the issue of constructive notice is not so one-sided that Gilbert is entitled to judgment as a matter of law. Whether the complaints referenced in the DOJ and MDHR reports (and the findings of racial disparities in the Hennepin County Public Defender and ACLU reports) are sufficient to constitute tacit authorization or deliberate indifference requires an inferential step—one that falls within the province of the jury, not the Court. *Anderson*, 477 U.S. at 255. Moreover, the general nature of the findings in the reports, without more, cannot establish as a matter of law that previous complaints bear sufficient factual similarity to establish the second element of this claim. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (affirming summary judgment in favor of the municipality where the plaintiff presented evidence of previous complaints, but did not show that "the incidents giving rise to these [previous] complaints [bore] some factual similarity" to the circumstances surrounding the section 1983 claim at issue); *see also Brewington*, 902 F.3d at 802 (affirming summary judgment in favor of the municipality where the plaintiff presented evidence of prior complaints, but the existence of these complaints was insufficient to satisfy this element of *Monell* and listing cases, including *Pineda v. City of Houston*, 291

F.3d 325, 329 (5th Cir. 2002) (concluding that eleven previous incidents of police misconduct was not sufficient to establish this element)).

Finally, questions of fact also preclude summary judgment when considering the third element: causation. Gilbert must establish that reasonable jurors would find a causal link between the complained-of injuries and the unwritten custom of using excessive force. *See Ricketts v. City of Columbia*, 36 F.3d 775, 779–80 (8th Cir. 1994) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."); *see also Ware*, 150 F.3d at 884–85 (concluding that the jury could find a causal link between the municipality's failure to address past instances of similar misconduct and the subsequent violation of the plaintiff's constitutional rights). In this case, Gilbert does not develop any explicit causation argument or otherwise identify evidence concerning this element. Absent such evidence, the Court must deny the summary judgment motion on Count II.

## II.     Count III

In Count III, Gilbert asserts that the City is liable under *Canton* for failing to properly train and supervise MPD officers to avoid the use of excessive force and unlawful restraint maneuvers. (Compl. ¶¶ 109–113.) To prevail on summary judgment, Gilbert must demonstrate that there is no a genuine dispute of material fact on the following three elements of his claim: (1) the City's police officer training and supervision practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting these training and supervision practices, and the City's failure to train and supervise was a result of deliberate and conscious choices it made; and (3) the City's alleged training and

supervision deficiencies caused Gilbert's constitutional deprivation. *See Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013). Again, the record presented contains fact disputes that preclude summary judgment of Count III.

To support its motion concerning the first element, Gilbert again relies on the findings in the reports. (*E.g.*, MDHR Report at 47 (finding that "MPD officers receive insufficient in-service training with respect to use of force"); DOJ Report at 83 (finding that MPD's training contained "systemic deficiencies . . . that contribute to the pattern or practice of violations" and that "revealed an overreliance on using force during encounters").) The reports also faulted MPD for failing to adequately investigate or discipline officers for their conduct. (MDHR Report at 43, 45 (finding that "MPD creates a culture that results in unnecessary escalation and/or excessive force during encounters with community members," stating that "[m]any officers reported . . . that violating a policy is not a significant problem because MPD does not hold officers accountable when policies are violated," and concluding that "supervisors are not adequately reviewing and assessing inaccuracies or false statements made by officers in their use of force reports"); DOJ Report at 81 (noting that "[d]iscipline for MPD officer misconduct is rare" and "[e]ven when officers admit policy violations, they may not be held accountable.")). Other evidence in the record, however, suggests that MPD officers were sufficiently trained in appropriate restraint techniques and avoiding the use of force. (*See* Doc. Nos. 68-1, 68-5, 68-6 (filed under seal).) Given this conflicting evidence, genuine issues of material fact remain concerning the adequacy of the training provided to members of the MPD.

To establish the second element: that the City "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation," *Brewington*, 902 F.3d at 803, Gilbert emphasizes the findings in the reports concerning the knowledge that City officials may have had. (MDHR Report at 69 (finding that "[f]ormer and current Mayors, City officials, Police Chiefs, and high-level MPD officials acknowledge that there is a problem with MPD's organizational culture that results in racial disparities"); (DOJ Report at 46 (quoting Mayor Jacob Frey as stating that "[w]e knew, and continue to know, there is disparate treatment" of communities of color), 83 (finding that "City and MPD leaders were candid in their assessment of MPD's training programs, saying, '[W]e have had a lot of problems'").) These statements and findings, however, are general in nature and do not concern specific training deficiencies. Nor do they refer precisely to the pertinent period of time preceding the 2019 incident at issue in this matter. Without more definitive evidence, the Court cannot grant summary judgment. Whether City policymakers had constructive notice or actual notice of the training deficiencies is a question for the jury. *Anderson*, 477 U.S. at 255; *see also Farmer v. Brennan*, 511 U.S. 825, 841 (1994) ("[L]iability is appropriate when policymakers are 'on actual or constructive notice' of the need to train.").

Finally, as to the element of causation, Gilbert has failed to identify evidence that would relate to or establish that the allegedly deficient training caused his injuries. Without such an argument, Gilbert cannot prevail on the motion for summary judgment.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT: Gilbert's Motion for Partial Summary Judgment (Doc. No. 35) is DENIED.

Dated: July 26, 2024                     /s/ *Jeffrey M. Bryan*
                                                                                                 Judge Jeffrey M. Bryan
                                                                                                 United States District Court